wiggs v. all saints

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-109-CV

THOMAS WIGGS AND PATRICIA WIGGS APPELLANTS

V.

ALL SAINTS HEALTH SYSTEM D/B/A APPELLEES

ALL SAINTS EPISCOPAL HOSPITAL/FORT

WORTH, GEORGE CRISP, M.D., ALLEN

KENT, M.D., AND ROBERT LAGON, M.D.

------------

FROM THE 67
TH
 DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

I.  I
NTRODUCTION

This is a medical malpractice case in which appellants Thomas and Patricia Wiggs (“the Wiggs”) claim negligent acts of appellees All Saints Health System d/b/a All Saints Episcopal Hospital/Fort Worth and Drs. George Crisp, Allen Kent, and Robert Lagon caused Mr. Wiggs’s loss of vision following back surgery.  The Wiggs offered the testimony of their designated experts, Drs. Richard Watkins and James Key, on the alleged cause of Mr. Wiggs’s condition, which they identified as ischemic optic neuropathy (“ION”). According to Dr. Watkins, prolonged hypertension and significant blood loss during Mr. Wiggs’s surgery resulted in hypoperfusion and lack of blood and oxygen to his optic nerves, causing ION.

On the appellees’ motion, the trial court excluded the medical causation testimony of the Wiggs’ experts as scientifically unreliable.  The trial court then entered a final take-nothing judgment in favor of appellees, on the basis that the Wiggs had no evidence of causation.  In two issues, the Wiggs contend the trial court erred by excluding their medical causation testimony and granting judgment against them for lack of such testimony.  We affirm.

II. S
TANDARD
 OF
 R
EVIEW
 
FOR
 E
XPERT
 T
ESTIMONY

An expert may testify on scientific, technical, or other specialized subjects if the testimony would assist the fact finder in understanding the evidence or determining a fact issue.  
Tex. R. Evid.
 702.  A two-part test governs whether expert testimony is admissible:  (1) the expert must be qualified; and (2) the testimony must be relevant and based on a reliable foundation. 
 Id.;  E.I. du Pont de Nemours & Co. v. Robinson
, 923 S.W.2d 549, 556 (Tex. 1995) (adopting 
Daubert v. Merrel Dow Pharms., Inc
., 509 U.S. 579, 591-92, 113 S. Ct. 2786, 2976 (1993)).  The proponent of the expert testimony bears the burden of showing both tests have been met. 
 Tex. R. Evid.
 104(a), 702; 
Robinson
, 923 S.W.2d at 557.  The trial court makes the threshold determination of whether the expert and the proffered testimony meet these requirements.  
Robinson
, 923 S.W.2d at 556-57; 
Marvelli v. Alston
, 100 S.W.3d 460, 474-75 (Tex. App.—Fort Worth 2003, pet. denied).  The trial court has broad discretion to determine admissibility, and we will reverse only if there is an abuse of that discretion.  
Robinson
, 923 S.W.2d at 558.  A reviewing court cannot conclude that a trial court abused its discretion if, in the same circumstances, it would have ruled differently or if the trial court committed a mere error in judgment.  
Id.
  Instead, the test is whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary and unreasonable.  
Id.

III.  T
HE
 R
ELIABILITY
 
OF THE
 E
XPERT
S’
 C
AUSATION
 T
ESTIMONY

In issue one, the Wiggs contend that the trial court erred by finding that they failed to show a reliable scientific basis for the causation testimony offered by their experts, by excluding the medical causation testimony of their experts as scientifically unreliable, and by granting judgment against them for lack of causation testimony.  Specifically, the Wiggs claim that the trial court excluded the testimony without reference to the applicable guiding rules or principles, constituting an abuse of discretion which resulted in the rendition of an improper judgment in this case.  In issue two, the Wiggs argue that the trial court also erred if the medical causation testimony was excluded for any reason other than scientific unreliability.
(footnote: 1)
A.  Standard of Review

Expert testimony must be based on a reliable foundation of scientific or professional technique or principle. 
 Robinson
, 923 S.W.2d at 557.  When the expert’s underlying scientific technique or principle is unreliable, the expert’s opinion is no more than subjective belief or unsupported speculation and is inadmissible.  
Id
.  In ensuring that the testimony rests on a reliable foundation,  the trial court is not to determine whether an expert’s conclusions are correct, but only whether the analysis used to reach those conclusions is reliable considering all the evidence.  
Gammill v. Jack Williams Chevrolet, Inc.
, 972 S.W.2d 713, 728 (Tex. 1998); 
Marvelli
, 100 S.W.3d at 475. 

In 
Robinson
, the Texas Supreme Court set forth six factors, now known as the 
Daubert/Robinson
 factors, to aid courts in determining whether scientific testimony is reliable: (1) the extent to which the theory has been tested; (2) the extent to which the technique relies on the expert's subjective interpretation; (3) whether the theory has been subject to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses that have been made of the theory or technique.  
Robinson
, 923 S.W.2d at 557
; Gammill,
 972 S.W.2d at 720-21;  
Marvelli
, 100 S.W.3d at 475.

 Following 
Robinson
, the Texas Supreme Court addresses the issue of scientific and nonscientific evidence
 and determined that while all expert testimony must be reliable before it may be admitted, the factors affecting reliability as outlined in 
Robinson
 are not applicable to all expert testimony.  
Gammill
, 972 S.W.2d at 726.  Instead, where experts rely on experience and training rather than a particular methodology to reach their conclusions, 
Gammill 
directs us to determine whether there may be “simply too great an analytical gap between the data and the opinion proffered” for the opinion to be reliable.  
Id.
; 
JCPenney Life Ins. Co. v. Baker
, 33 S.W.3d 417, 428 (Tex. App.—Fort Worth 2000, no pet.).

Still, in discharging its duty as “gatekeeper,” the trial court is in the best position to decide whether some or all of the 
Daubert/Robinson
 factors and/or the 
Gammill
 general reliability test should be applied to determine the reliability of the expert’s testimony.  
Gammill
, 972 S.W.2d at 726; 
see Couch v. Simmons
, 108 S.W.3d 338, 342-43 (Tex. App.—Amarillo 2003, no pet.) (applying 
Daubert/Robinson 
factors and 
Gammill 
analytical gap test); 
see also
 
Mo. Pac. R.R. Co. v. Navarro
, 90 S.W.3d 747, 758 (Tex. App.—San Antonio 2002, no pet.) (applying 
Daubert/Robinson 
factors and 
Gammill 
analytical gap test).

B.  Application

On appeal, the Wiggs argue that the trial court incorrectly applied the 
Daubert/Robinson 
factors to this case because their experts’ opinions were based on the experts’ knowledge, skill, experience, training, and education.  
See Gammill
, 972 S.W.2d at 726; 
JCPenney Life Ins. Co.
, 33 S.W.3d at 428.  They conclude, therefore, that the trial court should have applied the “analytical-gap” test, and that by allegedly excluding the testimony as scientifically unreliable under the 
Daubert/Robinson 
factors, the trial court abused its discretion by acting without reference to the applicable guiding rules and principles.  In other words, the Wiggs contend that by applying the wrong standard, the trial court applied no standard.  We disagree.

In their motions to exclude, appellees asserted that the opinions of Drs. Watkins and Key lacked a reliable scientific basis because they did not conform to the analysis under the 
Daubert/Robinson
 factors.  While it is true that the trial court agreed with appellees in the result, the trial court’s order excluding the testimony does not specify what analysis the trial court applied in assessing the reliability of the testimony.
(footnote: 2)  Moreover, a review of the record indicates that regardless of the standard the trial court applied in excluding the testimony, it did not abuse its discretion in determining that the experts’ testimony was scientifically unreliable in this case.
(footnote: 3)  
See Gammill
, 972 S.W.2d at 724-25.

1.  
Daubert/Robinson
 Factors 

Analyzing the evidence in this case in light of the 
Daubert/Robinson 
factors, we conclude that the evidence shows that the theory relied on by the experts has not been sufficiently tested, is controversial within the relevant scientific community, requires subjective interpretation, and has not been subjected to sufficient peer review.  Moreover, the evidence shows that the experts failed to sufficiently rule out other causes.  On appeal, the Wiggs fail to argue that their experts’ causation testimony was reliable under the 
Daubert/Robinson 
factors and do not attempt to contradict the evidence cited by appellees to establish unreliability under the factors.  The trial court, therefore, did not abuse its discretion in determining that the experts causation testimony was scientifically unreliable under the 
Daubert/Robinson 
factors. 

2.  
Gammill’s 
Analytical Gap Test 

In applying 
Gammill’s 
“analytical gap” test, which the Wiggs contend is required, we must analyze the underlying data forming the basis for the expert’s opinion.  972 S.W.2d at 726; 
D.S.
, 19 S.W.3d at 529.  “If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable.”  
Merrell Dow Pharm., Inc. v. Havner
, 953 S.W.2d 706, 714 (Tex. 1997), 
cert. denied
, 523 U.S. 1119 (1998).  In the present case, the trial court properly recognized that the experts’ experience and training and the medical literature that served as the basis for their opinions were unreliable, which also rendered their opinions unreliable. 

a.
  
Dr. Watkins’s Experience and Training

Dr. Watkins’s opinion was purportedly based on his qualifications as an anesthesiologist, his experience in providing anesthesia care to more than 7,000 patients during surgery, a review of Mr. Wiggs’s medical records, and medical literature.  The quantity of Dr. Watkins’s “experiences” in cases of this nature is insufficient to render his opinion on causation reliable.  Of all his cases, less than one percent involved providing anesthesia care to patients undergoing spinal surgery.  Moreover, Dr. Watkins has never administered anesthesia in a case like the present one, where the patient was undergoing multiple procedures during one surgery, and where the neurosurgeon did not become involved in the surgery until after the surgery had begun.

The quality of Dr. Watkins’s experience does not make his opinion on the cause of ION any more reliable.  Of the 7,000 patients to whom he has administered anesthesia, only one “may have had” ION.  “Certainly, if [an expert] is primarily depending on his experience to support his opinion, he would have to have seen it more than once.”  
State Farm Lloyds v. Mireles
, 63 S.W.3d 491, 499 (Tex. App.—San Antonio 2001, no pet.).  Dr. Watkins’s lack of personal experience with patients having ION amounts to no experience at all.  Likewise, Dr. Watkins has no special training regarding ION and its causes.  He has never treated anyone for ION, nor has he ever made a diagnosis of ION.  Finally, Dr. Watkins has never authored medical journal articles on ION.

b.  Dr. Key’s Experience and Training

Dr. Key’s opinion was purportedly based on his qualifications as an ophthalmologist, his experience in evaluating and diagnosing ION, his examination of Mr. Wiggs, and his knowledge of medical literature dealing with ION.  Dr. Key’s experience as a general ophthalmologist does not make his opinions on causation reliable.  Approximately 30% of his clients are contact lens patients, 30% are glasses patients, and 20% are cataracts patients.  The remaining 15-20% are a general mix consisting mostly of acute problems, such as red eyes, discharge, pain, and retinal problems.  Moreover, since becoming an doctor in 1970, Dr. Key has diagnosed only 40 post-surgery ION patients.  Although this experience might provide a basis for Dr. Key to express an opinion on diagnosing and treating ION, it does not provide a reliable basis for him to render an expert opinion on what caused a particular patient’s ION.  Additionally, Dr. Key likewise has no special training regarding ION and its causes.  Finally, he has conducted no studies or research concerning ION.

c.  Medical Literature

If a medical expert seeks to support his opinion on causation with medical literature, he must base his opinion on a “broad reading of the medical literature.”  
Minn. Min. & Mfg. Co. v. Atterbury
, 978 S.W.2d 183, 193 (Tex. App.—Texarkana 1998, pet. denied).  “Broad reading of medical literature” means that the expert must “point to specific passages in varied and different sources that are generally accepted as support for his conclusion.” 
 Id
.  Here, although the Wiggs assert that Dr. Watkins’s opinions were based on a “broad reading of medical literature,” Dr. Watkins admitted that he merely “pulled” only two articles.  He also neither explained how the two articles — or any other articles — supported his opinion nor pointed to specific passages supporting his opinion.

Moreover, none of the medical literature cited by the Wiggs concludes, as posited by Drs. Watkins and Key, that “prolonged hypotension and significant blood loss” actually causes ION.  Instead, the literature they cite demonstrates that the causes of ION are simply unknown in the scientific community.  For example, the journal article entitled “Unilateral Blindness After Prone Lumbar Spine Surgery,” authored in 2001, discussed the case of ION occurring after an uneventful spine operation in a relatively healthy man.  The article noted that “[c]learly, other factors, intrinsic either to the patient (e.g. ocular vascular anatomy, coexisting illness) or to the operation . . . may have important contributory roles in the development of postoperative visual deficits.”  The article concludes by stating that “despite the apparent increase in the incidence of peri-operative visual deficits over the past 5-10 yr, we do not know the precise etiologic factors, nor do we know how to prevent it.”

Another journal article furnished by the Wiggs, entitled “Postoperative Visual Loss, Still No Answers — Yet,” authored in 2001, similarly demonstrates that causation of ION remains unclear.  It notes that post-operative vision loss has “evoked controversy,” and asks the rhetorical question, “Is it a preventable injury?”  The article further confirms that ION occurring during surgery is rare, with incidents of post-operative vision loss in a general surgical population being one in 61,000.  The article concludes by stating that “[t]his low incidence renders a prospective study difficult if not impossible.”

In summary, the doctors’ experience and training in their respective fields and the medical literature did not form a reliable basis for their opinions as to the cause of Mr. Wiggs’s post-operative vision loss.  When the bases for the experts’ opinion are unreliable, their opinions are also unreliable. 
 Havner
, 953 S.W.2d at 714.  Therefore, because an analytical gap exists, the trial court did not abuse its discretion by excluding the experts’ testimony as scientifically unreliable.  
Gammill
, 972 S.W.2d at 726.

IV.  C
ONCLUSION
 

Since the Wiggs presented no causation evidence other than that of Drs. Watkins and Key, and the trial court ruled their testimony was not reliable, an essential element of the Wiggs’s claims is not supported by evidence.  
Marvelli
, 100 S.W.3d at 475.  Accordingly, the take-nothing judgment rendered by the trial court against the Wiggs was appropriate.  We overrule the Wiggs’s first issue.  In light of our decision, we need not address the Wiggs’s remaining issue on appeal.  
See 
Tex. R. App. P.
 47.1.  We affirm the trial court’s judgment.

SAM J. DAY

JUSTICE

PANEL B: DAUPHINOT and HOLMAN, JJ.; and SAM J. DAY, J. (Retired, Sitting by Assignment).

DAUPHINOT, J. dissents without opinion.

DELIVERED:  December 31, 2003

FOOTNOTES
1:
The Wiggs explain that they have included this issue and addressed the experts’ qualifications and the relevance of their opinions out of fear that the broad nature of appellees’ motion might allow this court to find the trial court did not abuse its discretion by excluding the experts’ testimony for a reason other than scientific unreliability.  However, the trial court specifically stated that the lack of scientific reliability was the reason it excluded the testimony.

2:
“[A]fter careful reconsideration of the various motions, [the Wiggs] response, case law cited and arguments of all interested counsel, the Court finds that it should exclude any causation testimony from [the Wiggs’] experts claiming that the surgery performed for [Mr. Wigg] allegedly caused [ION] because [the Wiggs] cannot show a reliable scientific basis for the opinions offered by their expert[s].”

3:
The Wiggs cite no cases, and we find none, holding that it is an abuse of discretion for the trial court to apply the 
Robinson
 factors to assess the reliability of an expert’s opinions.  Although the Wiggs cite 
Henderson v. State
, 77 S.W.3d 321 (Tex. App.—Fort Worth 2002, no pet.), 
In re D.S.
, 19 S.W.3d 525 (Tex. App.—Fort Worth 2000, no pet.), and 
J.C.Penney Life Insurance Co.,
 33 S.W.3d 417, none of these cases hold that it is an abuse of discretion to apply 
Robinson
 factors to determine the reliability of medical expert causation testimony.  Moreover, in each of these cases, the testimony was based on the expert’s many years of direct experience with observable, uncontroversial clinical phenomenon.  
Henderson
, 77 S.W.3d at 323-26 (testifying whether blow to child’s head was accidental); 
D.S.
, 19 S.W.3d at 528-30 (testifying whether burns suffered by child were accidental); 
J.C.Penney Life Ins. Co.
, 33 S.W.3d at 425-28 (testifying whether decedent suffered from heart problems at the time of his death).