Appellant’s Motion for Rehearing Overruled; Majority and Dissenting Opinions
of April 20, 2010, Withdrawn; Affirmed and Substitute Majority and Substitute
Dissenting Opinions filed June 17, 2010.

 

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00089-CV

___________________

 

Lauren Taber, Individually and as Next Friend
to Jordan Robinson, A Minor, Appellant

 

V.

 

Catherine Nguyen Roush, M.D. and Plaza Ob-Gyn Associates,
P.A., Appellees



 



 

On
Appeal from the 334th District Court

Harris County,
Texas



Trial Court Cause No. 2003-45357

 



 

 

SUBSTITUTE DISSENTING OPINION

            I withdraw my dissenting
opinion issued April 20, 2010, and issue the following substitute dissenting
opinion in its place.

            This appeal presents the question: can a
medical malpractice plaintiff receive a fair hearing when the case involves a
battle of the experts where the most commonly accepted cause of a brachial
plexus avulsion such as that suffered by Jordan Robinson, supports the
plaintiff’s case, while the defendant doctor relies on a defense based on a
hypothesis that is (1) anecdotal, (2) speculative, (3) has no established use
outside the area of litigation, and (4) is not generally accepted in the
medical community as a legitimate explanation for the cause of brachial plexus
avulsions.  Because the majority uncritically glosses over the actual content
of appellees’ medical literature, and then relies on emanations from the
penumbra[1]
of that literature to hold that a medical hypothesis manufactured by a small
number of doctors laboring to create a defense to lawsuits of this type is
reliable and therefore admissible, I respectfully dissent.

Factual and
Procedural Background

            Appellant
was admitted to Park Plaza Hospital on the evening of October 27, 2002.  Dr.
Roush was consulted by telephone and she ordered that appellant’s labor be
induced due to pregnancy-induced hypertension.  At 5:54 p.m. on October 28,
2002, Dr. Roush was notified by telephone that appellant’s second stage of
labor had begun as she was fully dilated.  Dr. Roush instructed the nurses to
have appellant begin pushing.  At 7:34 p.m., Dr. Roush was called to the
hospital for the delivery as appellant had started involuntarily pushing.

While not certain of the
exact time of her arrival in the delivery room, Dr. Roush denied she arrived at
the last minute, but instead testified she arrived about fifteen minutes before
Jordan’s head delivered at approximately 8:07 p.m.[2]  At 8:06 p.m.
there is an entry in the nurse’s notes that the crown of Jordan’s head was
first observed.  At approximately 8:07 p.m., Jordan’s head delivered and there
was a “turtle sign,” which indicates that a shoulder dystocia has occurred.

The occurrence of a
shoulder dystocia greatly increases the chance that the newborn will suffer a
brachial plexus injury.[3] 
Shoulder dystocia is an obstetric emergency because of the potential serious
consequences that may result if it is not successfully addressed.  According to
Operative Obstetrics, because shoulder dystocia is a rare occurrence, “very
few graduating residents have seen or handled more than a few cases.  Therefore,
when presented with cases regarding shoulder dystocia, the inexperienced
obstetrician may panic and become confused, exerting unacceptable and
mal-directed forces upon the infant’s head and thus producing permanent
brachial plexus injury.”  Operative Obstetrics also reports that “the
majority of brachial plexus injuries involve extraction of the child’s body
within 3 minutes of the delivery of the head, that is, before the end of the
next uterine contraction.”  In addition, it has been reported in the medical
literature that “a clinician’s first reaction to a difficult delivery is to
exert considerably larger forces than he normally would.”[4]

Dr. Roush, a young
obstetrician less than a year out of residency, testified she diagnosed the
shoulder dystocia within ten seconds of the “turtle sign.”  According to an entry
in the nurse’s notes, Jordan’s delivery was complete at 8:08 p.m., about one
minute after the “turtle sign.”  During this short period of time between the
“turtle sign” and Jordan’s birth, Dr. Roush testified that she kept appellant
pushing and then successfully resolved the shoulder dystocia through the application
of two different maneuvers involving the use of two nurses.[5]  While Dr. Roush admitted
applying traction to Jordan’s head after the shoulder dystocia was relieved,
she denied applying excessive force to Jordan’s head and neck during the
delivery.  However, Jordan’s grandmothers, both of whom observed the birth from
behind Dr. Roush, testified Dr. Roush twisted, and turned, and pulled on Jordan
with such force, they thought she was going to break his neck.

It was undisputed at trial
that the most commonly accepted cause of brachial plexus injuries is a
physician, when presented with a shoulder dystocia, pulls excessively on the
head and neck of the newborn thus stretching out and injuring the nerves.[6]  According to Dr.
Rahul Nath, one of Jordan’s treating surgeons, the more severe the brachial
plexus injury, the more likely the injury was caused by pulling.  Dr. Nath also
testified that Jordan had a quite severe brachial plexus injury.

Eventually, appellant
filed suit alleging Dr. Roush breached the standard of care during her delivery
of Jordan by applying excessive force to Jordan’s head in response to the
shoulder dystocia situation.  In her defense against appellant’s accusations,
Dr. Roush designated experts[7]
who opined that brachial plexus injuries can be caused not only by excessive
force applied by the delivering physician, but also in utero by the natural
forces of labor.  Appellant filed a Daubert motion challenging the
scientific reliability of these experts’ opinions.[8]  Appellant
asserted “there is no scientific or medical evidence to support a permanent
brachial plexus injury, and in particular an avulsion, in utero from the
maternal forces of labor where you have an otherwise healthy baby.”  According
to appellant, “this is an unsupportable scientific hypothesis created by
[appellees] in an effort to avoid responsibility in malpractice actions.” The
trial court denied appellant’s motion and allowed Dr. Roush and her retained
experts to testify regarding the maternal forces of labor theory.  Ultimately
the case was submitted to the jury and they returned a verdict that Dr. Roush
was not negligent in her handling of Jordan’s delivery.  The trial court
eventually entered a take nothing judgment based on that verdict.  Appellant
filed a motion for new trial, which the trial court denied.  This appeal
followed.

Discussion

            On appeal,
appellant contends appellees’ expert opinions are unreliable and inadmissible
because they are based on controversial literature that suggests the maternal
forces of labor may cause some form of brachial plexus injury.  More
specifically, appellant argues the opinions are unreliable because (1) the
literature consists primarily of anecdotal case reports and speculative
hypotheses; and (2) there is an analytical gap between the type of injury described
in the literature, some form of brachial plexus injury, and the specific injury
at issue in this appeal, an avulsion.  According to appellant, because of these
flaws, the only support to be found in the record for appellees’ theory that
the maternal forces of labor can cause an avulsion, is the experts’ ipse
dixit that it is so.  I agree.

I.                  
Expert Opinion Testimony and the Standard of Review

“If scientific, technical, or other specialized
knowledge will assist the trier of fact to understand the evidence or to
determine a fact issue, a witness qualified as an expert by knowledge, skill,
experience, training, or education may testify thereto in the form of an
opinion or otherwise.” Cooper Tire & Rubber Co. v. Mendez, 204
S.W.3d 797, 800 (Tex. 2006) (quoting Tex. R. Evid. 702).  Expert testimony is
admissible if (1) the expert is qualified, and (2) the testimony is relevant
and based on a reliable foundation.  Id.  If the expert’s scientific
evidence is not reliable, it is not evidence.  Id.  Courts must make a
determination of reliability from all the evidence.  Merrell Dow Pharm.,
Inc. v. Havner, 953 S.W.2d 706, 720 (Tex. 1997).

Expert testimony must be based on a reliable
foundation of scientific or professional technique or principle.  Wiggs v.
All Saints Health System, 124 S.W.3d 407, 410 (Tex. App.—Fort Worth 2003,
pet. denied) (citing E. I. du Pont de Nemours & Co. v. Robinson, 923
S.W.2d 549, 557 (Tex. 1995)).  In addition, each material part of an expert’s
theory must be reliable.  Whirlpool Corp. v. Camacho, 298 S.W.3d 631,
637 (Tex. 2009).  The trial court’s determination that these requirements are
met is reviewed for abuse of discretion.  Mendez, 204 S.W.3d at 800.  The
test for abuse of discretion is whether the trial court acted without reference
to any guiding rules or principles.  Id.  Admission of expert testimony
that does not meet the reliability requirement is an abuse of discretion.  Id. 
When the expert’s underlying scientific technique or principle is unreliable,
the expert’s opinion is no more than subjective belief or unsupported
speculation and is inadmissible.  Wiggs, 124 S.W.3d at 410.  Causation
opinions based on possibility, speculation, and surmise are no evidence.  Havner,
953 S.W.2d at 711–12.

Far from the relaxed gatekeeper function suggested by
the majority, the Texas Supreme Court has determined that when expert testimony
is involved, courts are to “rigorously examine the validity of facts and
assumptions on which the testimony is based, as well as the principles,
research, and methodology underlying the expert’s conclusions and the manner in
which the principles and methodologies are applied by the expert to reach the
conclusions.”[9] 
Whirlpool Corp., 298 S.W.3d at 637 (emphasis added).  According to the
Texas Supreme Court, an expert’s opinion might be unreliable, for example, if
it is based on assumed facts that vary from the actual facts, or it might be
conclusory because it is based on tests or data that do not support the
conclusions reached.  Id.   

A reviewing court is not required to ignore gaps in
an expert’s analysis or assertions that are simply incorrect.  Mendez,
204 S.W.3d at 800.  Further, the Supreme Court made it clear that a trial court
is not required to admit evidence which is connected to existing data only by
the ipse dixit of the expert.  Id.  Indeed, an expert’s bald
assurance of validity is not enough.  Havner, 953 S.W.2d at 712. 
Instead, the underlying data should be independently evaluated in determining
if the opinion itself is reliable.  Id. at 713.

II.        Were the Challenged Expert Opinions Reliable?

It was undisputed at trial that the most commonly
accepted cause of brachial plexus injuries is excessive traction by the
delivering physician on the head and neck of the newborn.  Despite this, citing
a series of articles, case reports, summaries of medical literature, and
excerpts from medical textbooks, written by a small number of obstetricians, appellees’
experts each opined they believed Jordan’s avulsion was the result of either an
in utero event or was caused by the natural forces of labor.[10]  Therefore, I
begin with an examination of the literature appellees’ experts relied on in the
formation of their opinions.

A.        Appellees’ medical literature.

1.         Gary Cunningham
et al., Williams Obstetrics 460 (21st ed. 2001).

 

All testifying experts, including Dr. Roush,
agreed the medical textbook, Williams Obstetrics, is a reliable source
and is widely used in obstetrics and medical schools.  It concludes, “brachial
plexus injury usually results from downward traction on the brachial plexus
during delivery of the anterior shoulder.”  

 

Appellees attached Chapter 19 Dystocia
as an exhibit to their Daubert motion response:

BRACHIAL PLEXUS INJURY.  Injury to the brachial
plexus may be localized to the upper or lower part of the plexus.  It usually
results from downward traction on the brachial plexus during delivery of the anterior
shoulder.  Erb palsy results from injury to the spinal nerves C5-6 and
sometimes C7.  It consists of a paralysis of shoulder and arm muscles resulting
in a hanging upper arm that may be extended at the elbow.  Involvement of the
lower spinal nerves … always includes injury of the upper nerves and results in
a palsy including the hand, which can cause a clawhand deformity.  Hardy (1981)
studied the prognosis of 36 infants with brachial plexus injuries. 
Interestingly, shoulder dystocia had been reported in only 10 of these, and two
had been delivered abdominally.  Nearly 80 percent of these children had
complete recovery by 13 months, and none with residual defects had severe
sensory or motor deficits in the hand.  Jennet and associates (1992) and Gherman
and colleagues (1999) have presented evidence that brachial plexus injuries may
precede the delivery itself and may occur even prior to labor.

2.         Robert B. Gherman et al., Brachial
Plexus Associated with Caesarian Section & In Utero Injury, Am. J. Obstetrics
& Gynecology (1999).

During trial, experts for both sides were
questioned about this article, however, the article itself is not found in the
appellate record.  The majority places great emphasis on this article in
reaching the conclusion that appellees’ experts’ opinions were reliable. 
However, according to Dr. Bloom, appellant’s obstetrician expert, the article
reports six cases of permanent brachial plexus injury following caesarian
section; the unique features of which make them distinguishable and therefore
inapposite to Jordan Robinson’s case.  See Whirlpool Corp., 298 S.W.3d
at 637.

3.         Robert G. Gherman et al., Spontaneous
Vaginal Delivery: A Risk Factor for Erb’s Palsy?, 178 Am. J. Obstetrics
& Gynecology, 423 (1998).

This article, a retrospective study of hospital
records, again with Dr. Gherman as the primary author, was attached to
appellees’ Daubert Response.  In the article, Dr. Gherman noted that
even though permanent brachial plexus injuries represent only one to five
percent of total brachial plexus injuries, they “are the source of almost all
litigation related to shoulder dystocia.”

According to Dr. Gherman, “recent literature supports
the hypothesis that some cases of brachial plexus palsy may have an
intrauterine origin.”  In the comment section, the authors wrote: “our data,
taken together with the preceding reports, provide several lines of evidence to
show that not all Erb’s palsies[11]
are traction related.  Rather, an in utero insult perhaps combined with a
susceptibility to pressure to traction may be etiologic.”  The authors went on
to “acknowledge that among the cases of Erb’s palsy occurring without shoulder
dystocia, there may have been instances of nonrecognition or incomplete
documentation of a difficult delivery.  Concern over medicolegal implications,
however, would probably have led to an overdocumentation [sic] of maneuvers.” 
They went on to conclude:

Brachial plexus injury occurring without shoulder dystocia
is a distinct, real entity worthy of further study.  Many permanent brachial
plexus injuries may be due to in utero forces that precede the actual
delivery.  Before the recognition of the shoulder dystocia, a significant
degree of stretch or pressure may have already been applied to the brachial
plexus.  Moreover, even when a brachial plexus injury is associated with
shoulder dystocia, it may have occurred independent of traction applied by the
obstetrician.  In addition, attempts to predict those babies at risk for
permanent brachial plexus injury appear to be medically and economically
unsound.

According to Dr. Graham, one of appellees’ retained
experts, this is an article hypothesizing that the propulsive nature of
delivery is a possible cause of brachial plexus injuries.

Emphasizing a problem Dr. Gherman himself recognized
within the article, a Dr. Spellacy, in a letter to the journal editor,
challenged the reliability of Dr. Gherman’s conclusions:

Another explanation for their results is very possible. 
What if the operator experienced a shoulder dystocia and managed it by hard traction
on the infant’s neck to achieve delivery?  In a retrospective review of
hospital charts that type of case would not be classified as “shoulder
dystocia” in this study because no other maneuvers were performed.  The
excessive neck traction could result in more fractures and permanent Erb’s
palsy than occurs in infants who were managed by applying classic shoulder
dystocia maneuvers.

Dr. Spellacy concluded by writing “although the
authors have attempted to further understand the etiology of Erb’s palsy, these
retrospective data do not do that.”

4.         Robert B. Gherman et al., Brachial
Plexus Palsy: An in Utero Injury?, 180 Am. J. Obstetrics & Gynecology
1303 (1999).

In an article similar to the one discussed above, Dr.
Gherman wrote:

The incidence of permanent brachial plexus injury after
shoulder dystocia is 1.6%.  However, it accounts for almost all the shoulder
dystocia-related litigation.  Historic obstetric teachings have stated that
brachial plexus injuries result from excessive traction and flexion exerted on
the infant’s neck during delivery, thereby tearing or avulsing the cervical
nerve roots from the spinal cord.  In contrast, many recent reports have
suggested that a significant proportion of brachial plexus injuries may be in
utero phenomena.  Our purpose is to review the literature supporting the
concept that many cases of permanent brachial plexus palsy may be unavoidable,
unpredictable in utero injuries that occur without relation to traction and in
the absence of historic risk factors.”

By the author’s own admission, this article examined
only the literature that supported the hypothesis that permanent brachial
plexus injuries “may be unavoidable, unpredictable in utero injuries that occur
without relation to traction and in the absence of historic risk factors.”  In
addition, in the comment portion of the article, Dr. Gherman admitted “we
acknowledge that almost all the information concerning the relationship between
delivery, shoulder dystocia, and brachial plexus injury has been collected
retrospectively and therefore has inherent ascertainment bias.”  Dr. Gherman
concluded the article with this plea: “because there is no currently accepted
method to objectively quantify ‘excessive’ lateral traction, the mere
occurrence of brachial plexus injury should not therefore be taken as prima
facie evidence of medical negligence.”

Robert H. Allen, Ph.D., wrote a letter to the editor
of the journal criticizing Dr. Gherman’s conclusions.  Allen wrote: “because
underreporting of difficult deliveries is an acknowledged problem in labor
management, reappraisal should focus more on objectively defining, properly
managing, and fully documenting shoulder dystocia.  This would do more to
mitigate preventable brachial plexus injuries than any study of intrauterine
force effects.”    

In response to Allen’s letter, Dr. Gherman wrote:
“The goal of our review article was to suggest that some cases of brachial
plexus injury may be of intrauterine origin.”  In that same response, Dr. Gherman
agreed “that a ‘stretch’ injury is the most likely mechanism of brachial plexus
injury, compression of the brachial plexus by the symphasis pubis or uterine
anomalies may also be euologic.”  Curiously, in that same response, Dr. Gherman
attacked Allen’s own research and conclusions regarding the level of force
applied during delivery: “we therefore question the scientific validity of
making wide-ranging inferences from this single case of brachial plexus
injury.”  The same could be said about Dr. Gherman’s own writings on this
subject.

5.         Robert B. Gherman et al., Shoulder
Dystocia: The Unpreventable Obstetric Emergency with Empiric Management Guidelines,
195 Am. J. Obstetrics & Gynecology 657 (2006).

In this article the authors sought to “answer, in an
evidence-based format, the following questions: (1) Is shoulder dystocia
predictable?; (2) Can shoulder dystocia be prevented?; (3) When shoulder
dystocia does occur, what maneuvers should be performed?; and (4) What are the
sequelae of shoulder dystocia?”

They concluded that “further research into the
correlation between fetal acidemia in shoulder dystocia is required with a larger
number of patients so that an evidence-based time frame for shoulder dystocia
alleviation can be developed.”  They also called for “the commercial development
of a shoulder dystocia simulator that will not only allow healthcare providers
to practice the obstetric maneuvers but will also enable the generation of a
set of nonempiric guidelines.”

6.         Joseph G. Ouzounian et al., Permanent
Erb’s Palsy: A Lack of a Relationship with Obstetrical Risk Factors, 15 Am.
J. Perinatology 221 (1998).

The purpose of this retrospective study was to
describe the antepartum and intrapartum characteristics of a group of children
with permanent brachial plexus injuries in an effort to determine whether the
historic obstetric risk factors associated with permanent brachial plexus
injuries were present.  The authors concluded that the results of prior studies,
in conjunction with the results of the present study, “suggest that the brachial
plexus injury may result from in utero events or the normal delivery process
and not from traction applied at delivery.”

7.         Bernard Gonik et al., Mathematic
Modeling of Forces Associated with Shoulder Dystocia: A Comparison of Endogenous
and Exogenous Sources, 182 Am. J. Obstetrics & Gynecology 689 (2000). 

Beginning with the premise that the forces associated
with the birth process had been studied in only a limited fashion, the authors
of this article attempted to develop a simple mathematical model to predict the
contact “between the symphysis pubis and the base of the fetal neck.”

The authors then generated a large number of
mathematical formulas based on speculative conclusions and suppositions.[12] Following this,
they then admitted: “obviously, the mathematic exercise presented here can only
crudely examine this complex issue of forces and pressures related to the
shoulder dystocia event.”  Finally, the authors suggested that “more scientific
studies are needed to examine detailed aspects of the mechanics of brachial
plexus trauma in this specific setting to better define the factors leading to
injury.”

8.         Bernard Gonik et al., Prediction
of Brachial Plexus Stretching During Shoulder Dystocia Using a Computer Simulation
Model, 189 Am. J. Obstetrics & Gynecology 1168 (2003).

Citing his own previous articles as the supporting research,
Dr. Gonik designed another study to test the hypothesis that both endogenously
(maternal expulsion) and exogenously (clinician traction) applied forces can
result in brachial plexus stretching in the anterior presenting fetal
shoulder.  In this study, the “fetal model was developed by using a 9 month-old
child crash test dummy model, downscaled to estimate 90th percentile parameters
for a newborn infant.”  Then, “the left-sided (anterior facing) brachial plexus
was simulated by using a spring element.”  “The mechanical properties of the
nerve element were based on experimental data performed on rabbit tibial nerves
and were represented with a bilinear function.”  Finally, “the maternal pelvis
was built according to the 50th percentile dimensions of a female bony pelvic
model.  This multibody model consisted of 14 ellipsoids.”

Having gone through this exercise, the authors concluded
with this caveat: “because there are no currently established thresholds for
brachial plexus nerve disruption in the fetus, the results of our
experiments cannot be directly applied to the clinical arena.” (emphasis
added).

9.         Herbert F. Sandmire & Robert K.
DeMott, Erb’s Palsy Causation Iatrogenic or Resulting from Labor Forces?,
50 J. Reprod. Med. 563 (2005).

This article is a review of the literature addressing
the causes of brachial plexus injuries.  In the conclusion section, the authors
wrote: “The research by Allen and coauthors has the potential for producing
significant information that could be useful to obstetricians.”  The article
calls for more research and ends with the hope that the “myth that brachial
plexus palsy results from clinician-applied excess traction will hopefully be
dispelled.” 

10.       Herbert F. Sandmire & Robert K.
DeMott, Erb’s Palsy: Concepts of Causation, 95 Am. C. Obstetrics &
Gynecology 941 (2000). 

In a brief article that appellees’ own expert Dr.
Graham called an editorial, the authors wrote: 

What is the basis for the belief that Erb’s palsy is caused
by the birth attendant pulling too hard on the baby’s head?  Does it explain
all cases or even some of the cases?  How do those who assert that excessive
lateral traction is the cause know that excessive lateral traction actually
occurred?  Is it not time to stop blaming the birth attendant for most of the
Erb’s palsy cases?  The indirect evidence presented here supports the
propulsive nature of the stretching of the nerves involved. 

11.       H. F. Sandmire & R. K. DeMott, Erb’s
Palsy Without Shoulder Dystocia, Int’l J. Gynecology &
Obstetrics 253 (2002). 

This article was a review of “certain articles which
have provided evidence that Erb’s palsy can occur without associated shoulder
dystocia.”  Most prominent of these studies were those published by Gherman.  In
the results section, Sandmire and DeMott wrote that “the most probable cause of
Erb’s palsy, both with and without shoulder dystocia is the maternal propulsive
forces.”

12.       Herbert F. Sandmire & Robert K. DeMott,
Erb’s Palsy Causation: A Historical Perspective, 29 Birth 52 (2002). 

This study, consists of a review of certain
historical literature in the field, particularly studies with an ultrashort
second stage of labor (less than fifteen minutes), which reported brachial
plexus injuries.[13] 
While admitting it is still commonly accepted in the medical literature that
brachial plexus injuries are caused by clinician-applied excessive lateral
traction on the fetal head and neck, the authors hypothesize that “it is now
time to suggest that all of the preceding indirect evidence establishes the
maternal propulsive forces as the most likely cause of Erb’s palsy.” 

13.       Israel Alfonso et al., Intrauterine
Shoulder Weakness and Obstetric Brachial Plexus Palsy, 31 Pediatric
Neurology 225 (2004).

This case report described a 3-day-old male delivered
by uncomplicated caesarian section with right obstetrical brachial plexus palsy
and congenital arm atrophy.  The patient had a history of decreased right arm
movement that had been detected by fetal ultrasound at 18 to 20 weeks of
gestation.  According to the authors, the purpose of the case report was to suggest
that stretching of brachial plexus at birth sufficient to produce plexus injury
may occur in a patient with a vulnerable plexus even in the absence of traction
during delivery.

14.       Robert H. Allen & Edith D.
Gurewitsch, Temporary Erb-Duchenne Palsy Without Shoulder Dystocia or
Traction to the Fetal Head, 105 Am. J. Obstetrics & Gynecology 1210 (2005).

In this case report, the baby’s birth was videotaped
by the father.  After a thirty minute second stage of labor, the birth was
unattended (i.e., it was induced and then the doctor had minimal involvement
with the actual delivery).  The baby suffered a temporary brachial plexus
injury to the posterior shoulder/arm that had completely resolved four days
after birth.

In the Comment portion of the case report, Dr. Allen
wrote:

Controversy exists as to the frequency and degree of
brachial plexus impairment with neither strong traction nor in utero
abnormality.  This debate is largely based on interpretation of findings from
retrospective studies, where neonatal records coded for brachial plexus palsy
are matched to corresponding maternal records coded for shoulder dystocia. 
When injuries occur without evidence of shoulder dystocia, one view is that the
maternal complication must not have been recognized or coded; the other view is
that the injury must have occurred naturally.  A confounding issue in these
types of studies is how strictly shoulder dystocia or Erb-Duchenne palsy or both
are diagnosed and coded.  Both are subjective diagnoses and rates vary widely;
for example, shoulder dystocia incidences vary from less than 0.2% to more than
4%.  Some studies find that, among vaginal cephalic births, all injured
neonates are associated with shoulder dystocia deliveries.  Others find
brachial plexus impairments in average –weight or even small for gestational
age neonates, whose deliveries are unlikely to have been complicated by
shoulder dystocia.

…

Although precise causation cannot be determined, the most
biologically plausible explanations for temporary injury unrelated to clinician
traction must consider the physical properties of the brachial plexus and its
surrounding tissue, in utero positioning, and the mechanical forces of labor. …
The nerves and surrounding tissue of the brachial plexus have considerable
biologic variation, and muscle tone can vary with fetal well-being.  Therefore,
some fetuses may be more predisposed to brachial plexus injury than others. 
These phenomena may have contributed to temporary impairment in this case. …
Additional prospective study and research is certainly warranted to answer this
question more specifically.

15.       Ernest M. Graham et al., A
Retrospective Analysis of Erb’s Palsy Cases and Their Relation to Birth Weight
and Trauma at Delivery, 6 J. Maternal-Fetal Med. 1 (1997).

This article is a retrospective examination of all
live births at the Hospital of the University of Pennsylvania from January 1,
1987 to June 20, 1991.  The authors recognized that conventional medical wisdom
in obstetrics has held that the great majority of brachial plexus injuries are
due to recognizable birth trauma occurring in macrosomic fetuses.  They also
recognized that shoulder dystocia may be underreported in the obstetric
literature, and unrecognized shoulder dystocia may be associated with an
increased risk of neonatal injury.  They went on to state that some
investigators have noted cases of brachial plexus impairment occurring in
normal-sized infants delivered by cesarean section without any reported birth
trauma.  The authors then stated that the appearance of Erb’s palsy in the
newborn may not be as closely linked to birth weight and recognizable birth
trauma as has previously been thought.  The authors concluded the article by
stating “this has significant medical and medicolegal implications.”

16.       David Peleg et al., Fractured Clavicle
and Erb’s Palsy Unrelated to Birth Trauma, 177 Am. J. Obstetrics &
Gynecology 1038 (1997).

In yet another retrospective study, the authors began
with the premise that “strong downward traction of the head in an attempt to
deliver the anterior shoulder is thought to be the etiology of Erb’s palsy and
some clavicular fractures.”  They also recognized that shoulder dystocia is
underreported in the hospital records.  Despite this, they went on to speculate
that “even allowing for underreporting and differences in delivery technique,
at least some of these fractures and Erb’s palsies were completely idiopathic.” 
They conclude “it may be that the forces of labor, maternal pelvic anatomy, and
fetal position interact in such a way to make certain fetuses more susceptible
to spontaneous birth trauma.”  Finally, the authors conclude the article with a
plea: “the question remains whether anyone can be held responsible for those
birth injuries that occur in seemingly normal labor and deliveries.”

17.       Gary D. V. Hankins et al., Brachial
Plexus Palsy Involving the Posterior Shoulder at Spontaneous Vaginal Delivery,
12 Am. J. Perinatology 55 (1995).

This is a case report in which “the infant was
discharged at approximately 48 hours of life, having some minor movement of the
fingers noted prior to discharge.”

Based entirely on the information found in the
hospital record, the authors suggested that “some brachial plexus injuries may
be completely unrelated to manipulations performed at the time of delivery.  In
these cases it is most likely that maternal expulsive forces of delivery may be
partly or totally responsible for posterior or anterior arm injuries.”  The
authors reported that “the degree of shoulder dystocia was described as minimal
and delivery was effected with the use of the McRobert’s maneuver combined with
tractive forces that were described as equivalent to those exerted on the head
with any vaginal delivery.”

18.       Malcolm I. Levene et al., Fetal
and Neonatal Neurology and Neurosurgery, (3rd ed. 2001).

The authors recognized there is a hypothesis that brachial
plexus injury can occur in the absence of shoulder dystocia and that there may
be an intrapartum cause, possibly pressure of the shoulder against the sacral promontory,
or symphasis pubis.

19.       Raymond J. Jennett et al., Erb’s Palsy
Contrasted with Klumpke’s and Total Palsy: Different Mechanisms are Involved,
186 Am. J. Obstetrics & Gynecology 1216 (2002).

This article consists of a review of some of the
literature examining brachial plexus injuries with a special emphasis on
articles written by Dr. Gherman and Dr. Ouzounian.  It also examined six case
reports detailing brachial plexus injuries to the posterior arm of the newborn. 
Dr. Jennett postulated that the brachial plexus injuries were not the product
of excessive traction by the physician, but instead that “the irregular contour
of the posterior pelvis compared with the usual regular and smooth plane of the
anterior uterine wall could make it more likely that the posterior arm might
assume or be forced into an abnormal position.”

In a response to a letter to the editor asking a
question about their article, the authors wrote: “… these conditions are caused
by tears in the dura, with the incomplete or complete avulsion of the nerves
and therefore, if our conjectures or hypotheses are correct, had to have
occurred at the time that the anterior arm was backward rotated, abducted, or
placed in other abnormal positions.”

20.       Adam Romoff, Shoulder Dystocia:
Lessons From the Past and Emerging Concepts, 43 Clinical Obstetrics &
Gynecology 226 (2000).

Because of increasing obstetric concern over the
perceived increase in the number of shoulder dystocias in the face of increasing
birth weights, in this article, Dr. Romoff sought to introduce a new, more
objective definition of when a shoulder dystocia occurs.  

In the process of developing this new definition, Dr.
Romoff noted that “nature itself may apply inappropriate force, such as may
occur in precipitous labor, wholly unaided by the unfortunate obstetrician in
attendance.  Jennett et al. reported that 54% of brachial plexus injuries were
not associated with clinically detectable shoulder dystocia.  They postulated
that uterine maladaptation and inappropriate intrauterine forces may have
played an intrapartum or even antepartum role.”[14]

21.       Pamela D. Berens, Richard L.
Berkowitz & Brian C. Brost, Precis: An Update In Obstetrics &
Gynecology, Am. C. Obstetricians & Gynecologists (2nd ed. 2000).

This update for practitioners contains a section on shoulder
dystocia, which it defines “as the inability to deliver an infant using routine
obstetric maneuvers, after delivery of the fetal head, due to an arrest of the
forecoming shoulder behind the maternal symphysis pubis.”

The guide then instructed practitioners that “when
shoulder dystocia is diagnosed, the patient should be instructed to cease
pushing while attempts are made to relieve the obstruction.  A deliberate and
planned sequence of events should follow, including the recruitment of
obstetric assistance and the notification of anesthesia and pediatric support
services.”

While recognizing that brachial plexus injuries have
been reported to occur with breech deliveries and during otherwise
uncomplicated cephalic-presenting vaginal and cesarean deliveries, the update
recognized that as for the cause of those injuries, “the pathophysiologic
mechanism by which brachial plexus injury occurs has been greatly debated.”

22.       Gary D.V. Hankins et al., Operative
Obstetrics, (1995).

Appellees attached a small excerpt from Operative
Obstetrics to their Daubert response.  The textbook excerpt
mentioned that “not all cases of brachial plexus palsy occur during the
intrapartum period, but may be secondary to antepartum intrauterine events.” 
It then quoted from the American College of Obstetricians and Gynecologists
Technical Bulletin No. 159 (1991b):

It is not always possible to deliver an undamaged infant
after shoulder dystocia has been encountered.  Even when shoulder dystocia is
managed optimally, brachial plexus injuries may occur.  Some of these injuries
may be associated with the process of impaction at the symphysis or during
descent of the shoulders into the pelvis. 

            B.        The
expert opinions are not based on a reliable foundation .

            I turn now to
whether appellees’ experts based their opinion that natural forces of labor may
have caused Jordan Robinson’s avulsion is based on a reliable foundation.

If a medical expert seeks to support his or her
opinion on causation with medical literature, that opinion must be based on a
“broad reading of the medical literature.”  Wiggs, 124 S.W.3d at 410
(quoting Minn. Min. & Mfg. Co. v. Atterbury, 978 S.W.2d 183, 193
(Tex. App.—Texarkana 1998, pet. denied)).  “Broad reading of the medical
literature” means that the expert must “point to specific passages in varied
and different sources that are generally accepted as support for his
conclusion.”  Id.   Here, appellees failed to meet this requirement.

Initially, appellees’ experts did not base their
opinion that the natural forces of labor can be a possible cause of brachial
plexus injuries on a broad reading of the medical literature.  Instead, the
experts relied on a relatively small number of articles written by a few
authors, each of whom based their conclusions, in part, on the writings of the
other members of that small group.  In addition, an examination of the literature
cited by appellees reveals exactly how limited it is.  Much of the literature
consists of reviews and summaries of a limited number of articles advocating
the natural forces of labor hypothesis.  In addition, while appellees have
attempted to broaden the basis of their natural forces of labor opinion by arguing
medical textbooks have adopted it, I disagree.  Instead, the textbooks have, at
best, mentioned the existence of the natural forces of labor concept.  None of
the textbooks found in the appellate record have endorsed the natural forces of
labor hypothesis as a generally accepted method explaining how brachial plexus
injuries, much less avulsions, are caused.  This lack of adoption by medical
textbooks was confirmed by Dr. DeMott, one of the chief proponents of the
natural forces of labor hypothesis, when he testified in a 2004 deposition only
that medical textbooks “recognize our writings in this field.”

There are also limitations to the cited articles
because many of them involve retrospective studies.  Dr. Graham testified about
the problems associated with retrospective studies of hospital records. 
According to Dr. Graham, the most scientific type of medical research is Level
1 Research, which is a prospective, randomized clinical trial.  Dr. Graham also
testified that retrospective studies of hospital records are considered a lower
category of medical research.  According to Dr. Graham, a retrospective study
is placed in this lower category because, when looking at hospital records, the
researcher is at the mercy of whoever was writing the record and therefore the
study is subject to an inherent ascertainment bias.  This is a particular
problem when conducting research in the area of shoulder dystocias and brachial
plexus injuries because it is widely believed the incidence of shoulder
dystocia, because of the subjective nature of the diagnosis, is underreported
in the medical records.  Dr. Allen addressed how this underreporting impacts
medical research.  According to Dr. Allen, the lack of a shoulder dystocia
notation in a medical record can lead one researcher to conclude it is just
another example of underreporting, while another concludes it is evidence of an
intrauterine cause of brachial plexus injuries.

The majority cavalierly discounts the retrospective
nature of the studies by noting the absence of the preferred prospective
studies can be explained away by the potential ethical issues involved in
carrying out a prospective study.  It then concludes that reliance on
retrospective studies and the potential for ascertainment bias do not alone
warrant exclusion of the disputed expert testimony but instead should be
addressed through cross-examination.  In reaching this conclusion, the majority
overlooks the fact that the Texas Supreme Court has called for courts to
examine the entire record and to “rigorously examine the validity of facts
and assumptions on which the testimony is based, as well as the principles,
research, and methodology underlying the expert’s conclusions and the manner in
which the principles and methodologies are applied by the expert to reach the
conclusions.”  Whirlpool Corp., 298 S.W.3d at 637 (emphasis added).  The
majority also ignores the Texas Supreme Court’s fiat that each material part of
an expert’s theory must be reliable.  Id. 

Another problem with appellees’ defense theory is, as
Dr. DeMott’s deposition  testimony revealed, there is no way to prove or disprove
the natural forces of labor hypothesis because it would be unethical to conduct
that kind of study.  In addition, Dr. DeMott admitted there is a potential for
error rate but there is no medical literature testing that rate.  Finally, Dr.
Graham testified during trial, and Dr. Sandmire testified during a deposition,
that they did not consider any of the literature behind appellees’ natural
forces of labor defense to be reliable in a legal sense.

As touched on above, appellees also failed to
demonstrate that the medical community has generally accepted the natural
forces of labor concept.  Dr. Graham, appellees’ own expert, testified that,
under the scientific method, researchers begin with a hypothesis, then develop a
theory, and once the researchers establish the theory, that theory is tested
and only then do you get to where you have an accepted scientific fact.  Basic
to the scientific method is the premise that the conclusions reached are the
result of analysis.  Quiroz ex rel. Quiroz v. Covenant Health Sys., 234
S.W.3d 74, 89 (Tex. App.—El Paso 2007, pet. denied).  Coming to a firm
conclusion first and then doing research to support that conclusion is the
antithesis of the scientific method.  Id.  Here, appellees’ experts
relied on numerous articles that began with the conclusion that the maternal
forces of labor can cause a brachial plexus injury and then did research,
usually by simply excluding contrary studies, which supported the desired conclusion. 
By failing to critically examine the medical literature underpinning appellees’
experts’ opinions, the majority glosses over this fact.

According to Dr. Graham, the idea that the maternal
forces of labor can cause a brachial plexus injury remains a scientific hypothesis. 
In addition, many of the sources and authors cited by appellees in support of
their causation opinion confirm that the idea that the natural forces of labor
can cause brachial plexus injuries remains a hypothesis.  These include the
textbook Operative Obstetrics (“This concept had to be discarded when a
pertinent study showed that neuromuscular deficits develop much faster in fetal
than in adult pigs.  An alternative hypothesis, namely that brachial plexus
injury is frequently caused during the labor process by uterine forces, still
prevails.  However, since the maternal forces mobilized during labor and
delivery are expulsive in nature, it is difficult to perceive a natural
mechanism which could imitate the effect of traction injuries.”), Dr. Gherman
(“recent literature supports the hypothesis that some cases of brachial plexus
palsy may have an intrauterine origin”), Dr. Jennett (“…these conditions are
caused by tears in the dura, with the incomplete or complete avulsion of the
nerves and therefore, if our conjectures or hypotheses are correct, had to have
occurred at the time that the anterior arm was backward rotated, abducted, or
placed in other abnormal positions.”), and Dr. Gonik (“The study was designed
to test the hypothesis that both [the natural forces of labor and clinician
extraction] can result in brachial plexus stretching in the anteriorly
presenting fetal shoulder.”).  The majority explains away this problem by
stating the decision on whether to admit or exclude an expert’s opinion should not
be resolved simply on the author’s choice of words.  However, word choice,
particularly in the realm of medical literature, is important.  Here, the
authors and witnesses are doctors familiar with the scientific method and the
significant difference between a hypothesis and an accepted scientific fact. 
In addition, deciding the experts’ opinions are unreliable would not be based
simply on semantics because an examination of the content of the articles and
the witnesses’ testimony reveals their use of the word hypothesis was not mere
literary license but instead was based on the inescapable conclusion that the
substance of the challenged experts’ opinions, that the maternal forces of
labor may cause a brachial plexus injury, has not gained widespread acceptance
in the medical community and remains only a hypothesis.  See Marvelli v.
Alston, 100 S.W.3d 460, 470 (Tex. App.—Fort Worth 2003, pet. denied)
(“Whether expert testimony on causal connection rests upon reasonable medical
probability must be determined by the substance and context of the testimony
rather than semantics or use of a particular term or phrase”).

The controversial nature of the natural forces of
labor hypothesis was also confirmed by Dr. Nath, one of Jordan Robinson’s
treating physicians.  Dr. Nath testified that the idea that the natural forces
of labor could potentially cause a brachial plexus injury had only recently
appeared in the medical literature and it is not commonly accepted at all.

The foundation of the challenged expert opinions is
also unreliable because there is a significant analytical gap between the
natural forces of labor hypothesis and the injury actually suffered by Jordan
Robinson, an avulsion.  While there may be medical literature suggesting that
the natural forces of labor may be a potential cause of brachial plexus injuries,
none of appellees’ experts could point to a single article in the medical
literature reporting that an avulsion can be an in utero injury or the result
of the spontaneous forces of labor.  The absence of such an article was further
confirmed by deposition testimony of both Dr. DeMott and Dr. Gherman who
testified they were not aware of any articles in the medical literature that
shows an avulsion was caused by the natural forces of labor.  Both Dr. Roush
and Dr. Graham testified there is no medical literature that proves anything
other than excessive lateral traction by the clinician causes a brachial plexus
avulsion.  Finally, the articles cited by appellees’ experts are
distinguishable because they address labor and other issues not present in the
birth of Jordan Robinson.  These include an ultrashort second stage of labor,
caesarian section, maternal fibroids or other uterine abnormalities, facial
palsy, and problems with the long term positioning of the fetus within the
womb.   

Finally, an additional factor to consider is that,
after reviewing appellees’ literature, I believe that much of it was motivated
in no small part by concerns over the amount of litigation involving brachial
plexus injuries and the lack of a viable defensive theory in the face of the
only generally accepted cause of those injuries: excessive traction by the
delivering physician.  Many of the articles cited by appellees’ experts mention
litigation.  In addition, Dr. Graham admitted that one of the goals of the
American College of Obstetricians and Gynecologists, a leading publisher of
literature in this area, is the development of literature to defend lawsuits.

Because the law does not lead science, it should not
be hasty to impose liability when scientifically reliable evidence is
unavailable.  Havner, 953 S.W.2d at 728.  The same principle must hold true
when a defendant seeks to use scientifically unreliable evidence to avoid
liability.  Accordingly, after examining the entire record, I would hold that
appellees’ experts’ opinion, that the natural forces of labor can cause a
brachial plexus avulsion, is unreliable and inadmissible, and the trial court
abused its discretion in allowing the admission of this opinion testimony.  Whirlpool
Corp., 298 S.W.3d at 637; Mendez, 204 S.W.3d at 800.  To hold
otherwise under the facts of this case, as I mentioned at the beginning of this
dissenting opinion, calls into question whether the rules on the admissibility
of expert opinions are applied fairly and equitably to both medical malpractice
plaintiffs and defendants. 

C.        The admission of the natural forces of
labor opinion testimony was harmful.

Because I would exclude the challenged expert
testimony, I examine whether the trial court’s decision to allow the testimony was
harmful.  Tex. R. App. P. 44.1(a).  Once again, one must look to the whole
record to determine whether the error probably caused the rendition of an
improper judgment.  City of Brownsville v. Alvarado, 897 S.W.2d 750,
753–54 (Tex. 1995).

Initially, appellees contend appellant waived consideration
of the harm by failing to adequately brief the harm issue.  I believe appellant
adequately briefed the harm issue.  In her initial brief, appellant asserted:
“the Daubert challenge on this issue should have been sustained and the
testimony from the Defendants should not have been allowed.  Without the
testimony regarding the maternal forces of labor, all of the evidence pointed
to the avulsion being caused by Dr. Roush’s pulling on the child’s head.” 
Then, in her reply brief, appellant expanded on that argument.

It was undisputed that Jordan Robinson suffered an
avulsion, the most serious type of brachial plexus injury.  It was also
undisputed that excessive traction by the delivering physician is the most
common cause of brachial plexus injuries.  While hotly contested, Dr. Roush
denied applying excessive force to Jordan during the delivery.  However, her
testimony would only be credible if there was a medically plausible explanation
for how Jordan suffered an avulsion if the delivering physician did not apply
excessive force.  Therefore, we conclude the challenged expert testimony was
crucial to appellees’ defense.   Appellees’ trial counsel admitted as much when
he told the trial court: “Let me suggest, Judge, if you grant either one of
these [Daubert] motions, then the case is over on liability.  There is
no fact issue to go to the jury.”[15] 
Having examined the entire record, I would hold that the trial court’s decision
to admit the challenged expert testimony was harmful.

Conclusion

            I would sustain
appellant’s first issue on appeal, reverse the judgment of the trial court, and
remand this case to the trial court for further proceedings consistent with
this dissenting opinion.[16]

 

                                                                                    

                                                                        /s/        John
S. Anderson

                                                                                    Justice

 

 

 

Panel consists of Chief
Justice Hedges and Justices Anderson and Boyce. (Boyce, J., Majority).

 









[1] In 1873, Justice Oliver
Wendell Holmes defined the term penumbra as describing the “gray area where
logic and principle falter.”





[2] During this approximate
33 minute period of time between the telephone call and Jordan’s head
delivering, Dr. Roush had to (1) travel from her residence to the hospital,
which she testified took anywhere from ten to twenty minutes depending on
traffic, (2) make her way to the delivery room, (3) scrub in, and (4) place the
various drapes which she testified she uses in every delivery and which could
only be placed by her as they are sterile.





[3] The brachial plexus is a
series of nerves that come out of the neck and form a network, or a mesh, that
supplies the shoulder, arm, and the hand with movement, feeling, and in
children, growth.





[4] Allen, PhD, “Risk factors
for shoulder dystocia: An Engineering Study of Clinician Applied Forces” 
Obstetrics & Gynecology (1991).





[5] Over time, obstetricians
have developed maneuvers to address a shoulder dystocia. While there is no
required order in which these maneuvers must be performed, it is generally
accepted that the McRoberts maneuver, which consists of two nurses removing the
mother’s legs from the stirrups and sharply flexing them upon the mother’s
abdomen, and suprapubic pressure, should be the first maneuvers attempted.  Dr.
Roush testified she first applied McRoberts and then suprapubic pressure. 
There is no record that these maneuvers were performed in the nurse’s notes. 
However, Dr. Roush, after the delivery, and already aware that Jordan had a
brachial plexus injury, wrote a delivery note stating: “moderate shoulder
dystocia resolved with McRoberts and suprapubic pressure.”  





[6] Even Dr. Roush admitted
physician applied force is a known cause of this type of injury.





[7] Dr. Roush designated two
experts in addition to herself: Dr. Jack Graham, a maternal fetal
subspecialist, and Dr. Andrew Vadasz, a pediatric neurologist.





[8] Daubert v. Merrell Dow
Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 l.Ed.2d 469 (1993).

 





[9] It is for this reason
that I do not find the out of state cases cited by the majority persuasive. 
Unlike the majority, I do not believe the cited opinions make it clear that
Colorado and Louisiana impose the same strenuous gatekeeper function on the
trial judge that the Texas Supreme Court has imposed on Texas trial judges.





[10] The primary authors of
the literature appellees’ experts relied on include: Dr. Robert B. Gherman, Dr.
Joseph G. Ouzounian, Dr. Bernard Gonik, Dr. Raymond J. Jennet, Dr. Herbert F.
Sandmire and Dr. Robert K. DeMott.





[11] Injury to the brachial plexus can result in paralysis
of the muscles of the upper extremity.  Its incidence is approximately1.6 per
1,000 births.  Three forms of injury have been recognized: Duchenne-Erb’s
palsy, involving the upper arm, due to trauma to the fifth through the seventh
cervical nerve roots; Klumpke’s palsy, involving the lower arm, due to injury
of the eighth cervical and first thoracic roots; and complete paralysis of the
upper extremity.





[12]
A representative sampling of
the development of the authors’ formulas:

The endogenous force was
estimated according to the model of a piston (infant) within a thin-walled
pressure vessel (uterus).  The expulsive force on the piston (Fpiston)
was then defined as follows: Fpiston = Pchamber [x] Apiston
where Pchamber is the pressure developed within the vessel and Apiston
is the cross-sectional area of the moving structure.  For the case of
childbirth Pchamber can be assumed to be the intrauterine pressure
generated by uterine contraction and maternal bearing down and Apiston
represents the cross-sectional area of the infant’s body within the uterus. 
Because of the difficulty of determining this area as a result of the unknown
arrangement of the torso and limbs within the uterus and the variable and
complex geometry, the piston area was estimated as the mid-transverse
cross-sectional area as an ellipsoid and the cross-sectional area in the
mid-transverse plane was calculated from the following equation: Auterus
= πD [x] d/4 where D and d are the lengths of the major and minor axes of
the elliptic cross-section, respectively.  

 





[13] Appellant’s second stage
of labor was approximately two hours.





[14] Ultimately, Dr. Romoff
concluded that the best definition would be a neck-to-completion interval of
more than 60 seconds or the use of ancillary maneuvers to effect delivery.





[15] Appellees also filed a Daubert
motion seeking to exclude appellant’s expert testimony on causation.  That
motion is not at issue in this appeal.





[16] Because I would sustain
appellant’s first issue on appeal, I do not address her remaining issues.  Tex.
R. App. P. 47.1.