NO. 07-04-0058-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

MARCH 21, 2006

_____

GREGORY SHAWN BRYANT AND LINSEY KAY BRYANT,
INDIVIDUALLY AND AS REPRESENTATIVES OF THE ESTATE
OF KENNALEE D'LIN BRYANT, A DECEASED MINOR, APPELLANTS

v.

ERIC NICHOLAS LEVY, M.D., AMARILLO AREA HEALTHCARE
SPECIALISTS, L.L.P., NORTHWEST TEXAS HEALTHCARE
SYSTEM, INC., APPELLEES

_____

FROM THE 108TH DISTRICT COURT OF POTTER COUNTY;

NO. 89,510-E; HON. ABE LOPEZ, PRESIDING

_____

Before QUINN, C.J., REAVIS, J., and BOYD, S.J.[1]

**OPINION**

This is an appeal from a take-nothing summary judgment in favor of appellees Eric

Nicholas Levy, M.D. (Levy), Amarillo Area Healthcare Specialists, L.L.P. (AAHS), and

Northwest Texas Healthcare System (NWTHS). In pursuing the appeal, appellants

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by
assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon 2005).

Gregory Shawn Bryant and Linsey Kay Bryant, individually and as representatives of the Estate of Kennalee D'Lin Bryant, a deceased minor, present two issues for our decision. Those issues are whether 1) the trial court committed reversible error in granting the motions for summary judgment filed by appellees, and 2) whether reasonable minds could differ on the proximate cause of Kennalee's death. For reasons herein stated, we reverse the judgment of the trial court.

Factual History

Kennalee Bryant was born on December 28, 1999. On January 20, 2000, she was taken to her pediatrician, Dr. James Boger, because of congestion, a cough, a stuffy and runny nose, and dehydration. She was diagnosed as having an upper respiratory tract infection for which the doctor recommended fluids and over-the-counter medication. The infant's condition continued to worsen and on January 23, 2000, her mother, Linsey, was told by the pediatrician to take the child to Northwest Texas Hospital (NWTH). At the time, Kennalee had difficulty breathing, abnormal lung sounds including wheezes and rattles, retractions of the lungs, respirations of 80 per minute and an oxygen saturation of 80%. She was diagnosed with respiratory syncytial virus (RSV).

About 6:00 p.m. on January 23, the child was admitted to the pediatric ward of the hospital and given intravenous fluids and breathing treatments. However, her condition continued to deteriorate. Her retractions on breathing became severe, she began running a temperature, became pale, refused to take fluids and, although she was on oxygen and breathing treatments, her oxygen saturation remained low. At approximately 8:51 p.m., Dr. Rolf Habersang, a pediatric critical care doctor and a member of the AAHCS, was consulted. Dr. Habersang examined the child at 9:10 p.m. and assessed her as having

2

decreased sensation, poor responsiveness, severe retractions of the lower chest wall, and very decreased air exchange throughout her lungs.

Dr. Habersang transferred Kennalee to the pediatric intensive care unit and gave orders that the breathing treatments be continued and other medications be administered. Because the child's condition continued to worsen, at approximately 8:00 a.m. on January 24, Dr. Habersang decided to intubate her, placed her on mechanical ventilation, and placed a feeding tube in her. At approximately 10:30 a. m., appellee Levy assumed Kennalee's care.

At 12:50 p.m., as a result of a capillary blood gas test and increased agitation, Levy ordered additional medications. At 4:20 p.m., a blood gas was performed which showed a carbon monoxide level of 78.6. The normal range for carbon monoxide is 35 to 45. As a result of the increase, Levy ordered a change on the ventilator from 20 to 24 breaths per minute and ordered another blood gas to be drawn at 6:00 p.m. The 6:00 p.m. blood gas showed some improvement with the carbon monoxide level dropping to 46.5.

At 5:00 p.m., Shannon Brewster, a respiratory therapist employed by NWTHS, changed the ventilator, setting the tidal volume from 60 ccs to 65 ccs. There is no record of a physician's order for the change. At 5:10 p.m., Brewster also noted that Kennalee had tight wheezing and increasing carbon monoxide after receiving chest therapy. Kennalee's vital signs were taken at 6:00 p.m., although there was no examination. A respiratory therapist came into Kennalee's room around 7:10 p.m and began to assess her. At 7:20 p.m., the oxygen saturation level dropped to 50%, her heart rate dropped into the 70s, her blood pressure dropped to 64/28 and she began to turn blue. Cardiopulmonary resuscitation was begun by the nurse and respiratory therapists. Levy was not at the

3

hospital but was called, gave resuscitation orders to the nursing staff while driving to the hospital, and arrived some 12 minutes into the code.

After the resuscitation efforts, a pulse returned. Chest x-rays suggested the presence of air outside of the lungs and in the abdominal cavity, which caused Levy to believe that Kennalee suffered from a pneumothorax in both lungs through which large amounts of air escaped from her lungs into her chest and abdominal cavities. Continued resuscitation efforts were unsuccessful and the child expired at 9:10 p.m. An autopsy was performed which determined that the cause of death was hyaline membrane disease (diffuse alveolar damage), interstitial pneumonia, and acute bronchopneumonia.

Standard of Review

Levy and AAHS filed traditional and no-evidence motions for summary judgment under Texas Rule of Civil Procedure 166a(b) and (i), and NWTHS filed a no-evidence summary judgment motion pursuant to Texas Rule of Civil Procedure 166a(i). In *Kimber v. Sideris*, 8 S.W.3d 672, 674-676 (Tex. App.–Amarillo 1999, no pet.), this court had occasion to iterate in some detail the standards of review to be applied in cases of this nature in which such motions have been filed, and we refer to that case for a detailed description of those standards.

This appeal presents the question of whether there was more than a scintilla of evidence that Kennalee's death was proximately caused by the negligence of appellees. There is more than a scintilla of evidence when it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Pesina v. Hudson*, 132

4

S.W.3d 133, 136 (Tex. App.–Amarillo 2004, no pet.). Less than a scintilla is present when the evidence does no more than create a surmise or suspicion. *Id.*

Because appellants assert claims of medical negligence, raising a genuine issue of material fact on the issue of proximate cause requires proof from a competent expert witness. *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982); *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex. 1965). Proximate cause consists of two distinct elements, *i.e.*, cause in fact and foreseeability. *Arlington Mem'l Hosp. Found. v. Baird*, 991 S.W.2d 918, 922 (Tex. App.–Fort Worth 1999, pet. denied). Proof of the "cause in fact" element requires a showing that the defendant's conduct was a substantial factor in bringing about the alleged injury and without which the alleged injury would not have occurred. *Sisters of St. Joseph of Texas, Inc. v. Cheek*, 61 S.W.3d 32, 35 (Tex. App.–Amarillo 2001, pet. denied). Proximate cause must be based upon reasonable medical probability. *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995). Opinion evidence relied upon as proof must be based upon more than possibilities, speculation, and surmise. *Archer v. Warren*, 118 S.W.3d 779, 782 (Tex. App.–Amarillo 2003, no pet.). In evaluating opinion evidence, we look to the basis of the expert's opinion and not the opinion alone. A claim may not stand or fall upon the mere *ipse dixit*[2] of a credentialed witness. Whether expert testimony on causal connection rests upon reasonable medical probability must be determined by the substance and context of the testimony rather than semantics or use of a particular term or phrase.

---

[2]The term "*ipse dixit*" means "something asserted but not proved" and is literally translated "he himself said it." *See Marvelli v. Alston,* 100 S.W.3d 460, 478 n.6 (Tex. App.– Fort Worth 2003, pet. denied)*.*

A plaintiff, however, is neither required to establish causation in terms of medical certainty nor is the plaintiff required to exclude every other reasonable hypothesis. *Marvelli v. Alston*, 100 S.W.3d 460, 470 (Tex. App.–Fort Worth 2003, pet. denied). The quantum of proof required is simply "that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *See Kramer v. Lewisville Mem. Hosp.,* 858 S.W.2d 397, 400 (Tex. 1993). However, if an expert's opinion is based upon assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment. *See Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499-500 (Tex. 1995).

With regard to Levy and AAHS, appellants contend that Levy should have performed a chest x-ray at 4:20 p.m. to determine whether the results of a bad blood test were the result of a developing pneumothorax because it is forseeable to an intensivist that failing to order a chest x-ray will result in the failure to diagnose a pneumothorax. They additionally argue that had Levy ordered the x-ray, he would have seen the extra air and performed evacuation procedures which would have prevented the cardiac arrest that caused the child's death.

With regard to NWTHS, appellants note that the staff failed to report the clinical changes occurring in the child to Dr. Levy or some other doctor. It is forseeable to the staff, they contend, that a failure to report patient deterioration will result in the patient not receiving the care the patient needs, and had the staff properly reported Kennalee's continued deterioration to Levy or any other physician, then steps would have been taken

6

to diagnose the pneumothorax and drain the air outside the lungs, which would have prevented the cardiac arrest.

Appellants recognize that under the facts in this case, to raise an issue of proximate cause, they must have shown that the chest x-ray, if performed, would in reasonable medical probability have resulted in the institution of medical treatment which would have prevented Kennalee's death. They contend that they have done so by the testimony of their expert Dr. Tilelli. In particular, they refer to this portion of his deposition testimony:

> Q: Had the pneumothorax been corrected following the 4:00 p.m. capillary blood gas after a diagnosis by a chest x-ray, would Kennalee Bryant have gone into cardiac arrest at 7:20?
>
> *   *   *
>
> A: As-as-as both counsels for the defense have outlined, there are still mortal risks to this child who is seriously ill from -from bronchiolitis. However, in the experience I think of the majority of clinicians who take care of children with bronchiolitis, that survival is the rule even in the face of a pneumothorax when they are promptly drained.
>
> It is certain that an undrained pneumothorax will cause -and ultimately under these circumstances- will cause a cardiac arrest. And the drainage in the majority. And the vast majority of cases is associated with survival of these children.
>
> And so it's my opinion that had a pneumothorax been diagnosed at 4:20, and had it been appropriately evacuated, that the arrest would not have occurred.

They also cite another portion of Dr. Tilelli's testimony in which he opines:

> Q: Is it your opinion that the pneumothorax is what caused Kennalee Bryant to have a cardiac arrest?
>
> A: Yes.
>
> Q: Is it the cardiac arrest that ultimately took Kennalee Bryant's life?
>
> A: Yes.

The doctor's testimony, then, was that in his opinion, Kennalee had an undiagnosed and untreated pneumothorax that resulted in the cardiac arrest which caused her death. Dr. Tilelli also averred that if the pneumothorax had been timely treated, Kennalee would have continued to have a normal life span. Additionally, the doctor stated that if the caregivers notified Levy of Kennalee's continued deterioration and that "the patient is tight and wheezy and still has elevated and tidal $CO_2$'s," he would again have had the opportunity to order the chest x-ray that in Dr. Tilelli's opinion would have made the difference. He further agreed that a caregiver knows that if those types of deteriorative changes are not reported to a physician, the physician is not going to act. There is also evidence that no nursing notes were made from 11:45 a.m. until the code call at 7:20 p.m.

In summary, under the evidence in the summary judgment record, viewed in the light by which we must view that evidence, the trial court erred in granting its summary judgment. Accordingly, we must, and do hereby, reverse the judgment of the trial court and remand the cause to the trial court.

John T. Boyd
Senior Justice

8