

# NUMBER 13-10-00408-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JESSIE WHITE, ET AL.,**                                   **Appellants,**

**v.**

**BRUCE E. SCAFF, M.D.,**                                   **Appellee.**

---

### On appeal from the 220th District Court
### of Bosque County, Texas.

---

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Wittig[1]
### Memorandum Opinion by Justice Wittig

This is a medical malpractice case. The appeal is from a no-evidence summary judgment granted in favor of appellee, Bruce Scaff, M.D., and against appellants, Jessie White, individually and as representative of the estate of Mrs. Christina White, deceased, and Ramon and Florinda Coronado, individually. The summary judgment

---

[1]Retired Justice Don Wittig assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (West 2005).

was predicated upon the lack of expert causation testimony as a result of the trial court's decision to essentially strike the causation testimony of both of the Whites' experts, Clive Fields, M.D., and Horacio Adrogue, M.D.  In three issues, the Whites challenge the trial court's decision to strike the testimony of both Dr. Fields and Dr. Adrogue, and granting of the summary judgment.  We affirm in part and reverse and remand in part.

## I. BACKGROUND

Mrs. White, deceased, was a long-time patient of Dr. Scaff.  On September 26, 2005, she saw her doctor for severe right leg pain.  Mrs. White, 38, had received a kidney transplant when a teen, and at the time of her treatment, suffered from stage four renal insufficiency.  The doctor diagnosed a stress fracture and renal failure and prescribed Hydrocodone w/APAP 5/500 # 25.  Mrs. White returned and saw the doctor on October 3, 2005, still complaining of leg pain.   Dr. Scaff then additionally prescribed Oxycontin ER 20 m.g. #50.  Mrs. White was also referred to a kidney specialist.  Mrs. White became ill on October 6, 2005 after taking the medication and briefly went to the hospital. She died on October 8, 2005 at home.  The autopsy reported the cause of death as ingestion of Oxycontin and Hydrocodone.

Dr. Fields, one of the Whites' experts, testified that Dr. Scaff breached the standard of care by failing to consider Mrs. White's renal insufficiency while dosing the narcotic medications.  He further opined that this failure led to lethal levels of narcotics in her blood and that the lethal levels ultimately led to her death by overdose of the prescribed medications.  Because of Mrs. White's renal failure, she could not properly process the narcotics.

2

Dr. Adrogue opined that Dr. Scaff misdiagnosed Mrs. White's leg pain, which Dr. Adrogue opined was caused by taking a statin, not because of a stress fracture. No medication should have been prescribed and instead the statin should have been stopped. Dr. Adrogue also concurred that by putting Mrs. White on both Hydrocodone and Oxycontin, Dr. Scaff proximately caused her death. The witness stated that Dr. Scaff breached the standard of care and exposed Mrs. White to a high risk of serious or fatal complications. When introducing a new medication, an opioid, any other narcotic should have been discontinued because of high toxicity when two narcotics are prescribed simultaneously without proper dosage adjustment.

## II. STANDARD OF REVIEW

Rule 702 contains three requirements for the admission of expert testimony: (1) the witness must be qualified; (2) the proposed testimony must be scientific knowledge; and (3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. *See* TEX. R. EVID. 702; *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). Whether the trial court properly excluded expert testimony is subject to an abuse of discretion standard of review. *See Robinson*, 923 S.W.2d at 558. The trial court abuses its discretion when its decision is arbitrary, unreasonable, or without regard to guiding rules and principles. *Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). "Rule 702's reliability requirement focuses on the principles, research, and methodology underlying an expert's conclusions." *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002).

In reviewing the reliability of an expert's testimony, the court is not to determine whether the expert's conclusions are correct but "whether the analysis used to reach those conclusions is reliable." *Id.* Expert testimony involving scientific knowledge that is not grounded "'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.'" *Robinson*, 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 (1993)); *see Merrell Dow Pharms, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (noting that an expert's "bare opinions will not suffice" and the "substance of the testimony must be considered"). "Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590.

In discussing the reliance by an expert witness on differential diagnosis, the supreme court has held that the relevance and reliability requirements of Rule 702 apply to all expert evidence offered under that rule, even though the criteria for assessing relevance and reliability must vary, depending on the nature of the evidence. *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 216-217 (Tex. 2010), citing *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 727 (Tex. 1998); *see also Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637–38 (Tex. 2009). "The mere fact that differential diagnosis was used does not exempt the foundation of a treating physician's expert opinion from scrutiny—it is to be evaluated for reliability as carefully as any other expert's testimony. Both the *Robinson* and *Robinson/Gammill* analyses are appropriate in this context." *Id.* (citations omitted).

A summary judgment motion pursuant to Texas Rule of Civil Procedure 166a(i) is essentially a motion for a pretrial directed verdict. *Mack Trucks v. Tamez*, 206 S.W.3d

4

572, 581 (Tex. 2006). We review a trial court's ruling on a no-evidence motion for summary judgment for legal sufficiency. *Id.* at 581–82; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003). Accordingly, we review the evidence in the light most favorable to the non-movant, disregarding all contrary evidence and inferences. *City of Keller v. Wilson*, 168 S.W.3d 802, 825 (Tex. 2005) (noting that review of a "no-evidence" motion for summary judgment is effectively restricted to the evidence contrary to the motion); *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 772 (Tex. App.—Corpus Christi 2003, no pet.) (op. on reh'g). The burden of producing evidence is entirely on the non-movant; the movant has no burden to attach any evidence to the motion. *See* TEX. R. CIV. P. 166a(i). Summary judgment is improper if the non-movant produces evidence to raise a genuine issue of material fact. *See id.* To raise a genuine issue of material fact, the non-movant must produce more than a scintilla of probative evidence. *Ortega*, 97 S.W.3d at 772. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion of a fact.'" *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). Conversely, more than a scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)). In determining whether the non-movant has produced more than a scintilla of evidence, we review the evidence in the light most favorable to the non-movant, crediting such evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Tamez*, 20 6 S.W.3d at 582; *City of Keller*, 168 S.W.3d at 827.

5

## III. DISCUSSION AND ANALYSIS

### A. Dr. Fields

Olive Kevan Fields, M.D., is board certified in family medicine. He is an associate professor at Baylor College of Medicine, and on the clinical faculty of the University of Texas Health Science Center. He is in private practice in Houston and affiliated with Spring Branch Memorial Hospital and Memorial Hospital Memorial City. He has been listed in the Best Doctors in America, Texas's Top Doctors, Houston's Top Docs, and Who's Who in American Medicine.

The Whites argue that Dr. Fields' causation opinions were well founded. We agree. Both the autopsy and toxicology reports concluded that Mrs. White died from lethal and toxic doses of Hydrocodone and Oxycontin respectively. Dr. Fields and Dr. Adrogue each concluded that Dr. Scaff breached the standard of care in his treatment of Mrs. White by prescribing doses that were too high, given her renal insufficiency, her weight, and the fact that females excrete opiates more slowly than males. Both doctors concluded that because of her renal insufficiency, Mrs. White could not excrete the opiates at the same rate as a normal patient. Thus, the drugs backed up in her system resulting in her overdose and death. Dr. Adrogue further opined that the cause of Mrs. White's pain was not a stress fracture as diagnosed by Dr. Scaff, but rather, the pain was caused by the statin she was also taking. Dr. Adrogue stated the proper treatment required that she be taken off the statin and that no narcotics should have been prescribed. The experts concluded that Mrs. White's death was caused by the improper prescriptions of Oxycontin and Hydrocodone. By introducing a new opioid, any other narcotic should have been discontinued because of the high toxicity that

6

results when the two narcotics are given simultaneously without proper dosage adjustment.

The Whites agree that an expert's opinion can be unreliable even when the underlying data is sound if the expert draws conclusions from the data on flawed methodology, citing *Keo v. Vu*, 76 S.W.3d 725, 734 (Tex. App.—Houston [1st Dist.] 2002, pet denied). An expert who is trying to find a cause of something should carefully consider alternative causes and the failure to rule out other causes of the damage can render his opinion little more than speculation. *Robinson*, 923 S.W.2d at 559. However, the admissibility of an expert opinion does not depend upon the expert disproving or discrediting every possible cause other than the one espoused by him. *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987).

The Whites admit that Dr. Fields cannot rule out the possibility that the deceased committed suicide.[2] However, a fair reading of Dr. Fields' testimony indicates that suicide and other possible causes listed by defense counsel were not likely, i.e., these other possible causes were ruled out as probable alternatives. Based upon reasonable medical probability, the cause of Mrs. White's death was the excess medication prescribed by Dr. Scaff. Suicidal ideation (the thought process) cannot be ruled out by autopsy. Dr. Fields testified that: ". . . is there any possibility she could have committed suicide. I would say yes, it is a possibility." Opposing counsel questioned: "Can you rule out that possibility with certainty?" Dr. Fields answered: "No. I have—my opinions

---

[2] Section 93.001(a)(2) of the civil practice and remedies code provides that it is an affirmative defense to a civil action for damages for personal injury or death if the plaintiff, at the time the cause of action arose, was: committing or attempting to commit suicide, and the plaintiff's conduct in committing or attempting to commit suicide was the sole cause of the damages sustained; provided, however, if the suicide or attempted suicide was caused in whole or in part by a failure on the part of any defendant to comply with an applicable legal standard, then such suicide or attempted suicide shall not be a defense. TEX. CIV. PRAC. & REM. CODE ANN. § 93.001(a)(2) (West 2005) (emphasis added). This issue was not briefed by the parties and we need not address its application, *vel non*, given our disposition of the case.

7

are based on medical probability." Dr. Fields testified that a fair way to discuss other possibilities was that his opinions were based on reasonable medical probability, that other causes are unlikely, but they cannot be ruled out with certainty. The autopsy report specifically listed the cause of death as the ingestion of Hydrocodone and Oxycodone. The manner of death was consistent with "Accidental." The Tarrant County Deputy Medical Examiner stated: "the manner of death is likely accidental." Even Dr. Scaff agreed that Mrs. White, his twenty year patient, diligently took her medications as prescribed[3] and did not abuse her medications. Dr. Fields could reasonably rely on Dr. Scaff's admission that Mrs. White did not abuse medications, *inter alia*. Her husband Jessie testified Mrs. White followed her physician's orders when taking her medications. In her last days, he was sometimes there when she took her medications and "she took them like she was suppose[d] to." Other evidence points to Mrs. White's proper use of medications and no evidence was shown that Mrs. White committed suicide. Neither Dr. Fields nor Dr. Androgue were required to exclude every other possible hypothesis. *See First Assembly of God, Inc. v. State Utils. Elec. Co.*, 52 S.W.3d 482, 493 (Tex. App.—Dallas 2001, no pet.) (stating that it is sufficient to prove that the greater probability is that the defendant's conduct, alone or in contribution with others, was the cause of the harm). In the causation sense, a plaintiff is not required to exclude every other reasonable hypothesis, *see Marvelli v. Alston*, 100 S.W.3d 460, 470 (Tex. App.—Fort Worth 2003, pet. denied), and more than one proximate cause may exist. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001) (the

---

[3] Appellee objected to his own opinion about the proper taking of medication as "speculative" which was apparently sustained by the trial court as part of the defendant's motion in limine. No such objection was made at the deposition. The parties do not address the issue that experts are not necessarily limited to facts and opinions admitted in the record.

determination is whether the wrongful act "was 'a' proximate cause, not 'the' proximate cause" of decedent's death).  Proximate causation in a medical malpractice case must be based upon reasonable medical probability, s*ee Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995), and "[t]he quantum of proof required is simply that it is more likely than not that the ultimate harm or condition resulted from such negligence."  *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400 (Tex. 1993); *Rio Grande Reg'l Hosp., Inc. v. Villarreal*, 329 S.W.3d 594, 608 (Tex. App.—Corpus Christi 2010, pet. granted).

The Whites cite *Gammill,* discussing the reliability standard for expert testimony. *See Gammill*, 972 S.W.2d at 726.   The high court states that the considerations listed in *Daubert* and in *Robinson* for assessing the reliability of scientific evidence cannot always be used with other kinds of expert testimony.  *Id.*  For example, a beekeeper need not have published his findings that bees take off into the wind in a journal for peer review, or made an elaborate test of his hypotheses; observations of enough bees in various circumstances to show a pattern would be enough to support his opinion*.  Id.* "But there must be some basis for the opinion offered to show its reliability.  Experience alone may provide a sufficient basis for an expert's testimony in some cases, but it cannot do so in every case."  *Id.*  "The court in discharging its duty as gatekeeper must determine how the reliability of particular testimony is to be assessed."  *Id.*  A trial court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.  *Id.*

The Whites maintain that Dr. Fields' opinion is based upon reliable data, his experience and observations as the same type of physician as Dr. Scaff, and the

medical literature. Dr. Fields' foundational data consisted of the medical records, pharmaceutical records, sworn testimony, including Dr. Scaff's, the autopsy and toxicology reports, medical literature and pharmacy records. Undisputed facts include Mrs. White's kidney transplant and renal insufficiency of which Dr. Scaff was aware, and the need to consider the significant kidney disease when prescribing narcotics. According to published studies reviewed, plasma concentration versus time is doubled for patients with moderate renal failure and increased four times in patients with severe renal failure. Thus, lower doses or longer dosing intervals in such patients are suggested because the renal insufficiency increased the plasma concentration in Mrs. White from two to four times. Nevertheless, Dr. Scaff prescribed Oxycontin on top of Hrdrocodone just days before her death without appropriate reduction. Dr. Fields also observed: (1) 20 milligrams BID of Oxycontin as a starting dose in an opioid-naïve patient is at the high end for an 84-pound patient; (2) females metabolize this class of drugs at a lower rate than males, so females are typically started with a lower dose; and (3) even if Mrs. White did not have renal failure, the prescription was at a higher level for a woman of her diminutive size.[4]

Dr. Fields explained some of the physiology involved when dealing with Stage four renal insufficiency. The parent drugs, Hydrocodone and Oxycontin, are generally metabolized in the liver. The degree of renal insufficiency would result in decreased excretion of the drugs by the kidney, resulting in a longer half-life. The doses that were given were higher than appropriate and with the kidney not working normally, the drugs

---

[4] Dr. Fields noted that without the renal insufficiency, Mrs. White was unlikely to have toxic doses on autopsy. Technically, Mrs. White suffered from renal insufficiency, not a total renal failure. The terms "renal insufficiency" and "renal failure" were often used interchangeably in the record. Dr. Scaff's records even reflect "renal failure."

accumulated at a higher level than Mrs. White could tolerate. At stage four, Mrs. White's renal insufficiency was one stage shy of needing another transplant or dialysis. The pathologist, toxicologist, and both Dr. Androgue and Dr. Fields concluded that Mrs. White suffered from an overdose of Hydrocodone and Oxycontin. The experts' causation conclusions are patently supported by both the autopsy and toxicology reports.

Dr. Fields had experience treating hundreds of patients with renal insufficiency, including twenty transplanted patients, as well as experience prescribing Hydrocodone. He concluded, based on his experience and training, the elevated opiate drug levels in Mrs. White's system were the result of improper dosage for a person suffering from renal insufficiency. He explained why the drugs could not be excreted fast enough due to her renal failure. The post mortem toxicology showed: (1) Hydrocodone─blood 205.2 ng/ml; and (2) Oxcodone─blood 610 ng/ml. Thus, there is no analytical gap between the data and Dr. Fields conclusions.

Dr. Scaff disagreed with his own records regarding his notations for the prescription of Tylenol #3 at the relevant time. His records indicate Mrs. White was given Tylenol #3. He described that he usually prescribes Hydrocodone with APAP or generic Vicodin. But Mrs. White told him that Hydrocodone made her sick so he prescribed her something milder, Tylenol No. 3. According to Dr. Scaff, she walked down the hall, turned around and came back, and said she changed her mind and requested Hydrocodone. Dr. Scaff testified he rewrote the prescription changing it back to Hydrocodone. He said he was already finished with her chart and was seeing another patient so he didn't go back and correct his chart. Both prescriptions have

11

Acetaminophen while one has Codeine and the other has Hydrocodone. He gave her the routine dose with 5 milligrams of Hydrocodone and 500 milligrams of Acetaminophen. He testified he wrote for her to take half to one tab every six hours PRN. Days later, when he added the Oxycontin, he testified he orally instructed Mrs. White to take one or two Hydrocodone and after that she should not have been taking Hydrocodone. According to Dr. Scaff, she should have only had a few Hydrocodone left when he prescribed the Oxycontin.

Dr. Scaff uses a shotgun approach to argue "missing links" in Dr. Fields' causation opinion. Among other things, he argues that because there are no toxicology tests indicating the numerical level of metabolites from the opiates, that there is no foundation for the causal link between Mrs. White's renal failure and the backup of drugs in her system. This argument ignores Dr. Fields' testimony that the elevated levels (lethal and toxic) of the parent drugs were the cause of death. He testified: "In this report, (autopsy) the pathologist has measured or has documented the parent drug levels as the cause of death. I believe it is likely, in all reasonable medical probability, that the metabolites also were part of that, the—toxic effect of those drugs." Thus, metabolites were likely also present and contributed to her death. While Dr. Scaff's attorney spent a lot of time getting Dr. Scaff to testify how the liver breaks down the drugs into metabolites, which are then excreted by the kidney, Dr. Scaff points to no science or testimony that you must know the numerical level of metabolites to ascertain the kidney function is insufficient. Rather, the fact of Mrs. White's renal insufficiency is well established, including Dr. Scaff's own testimony. Mrs. White had only one kidney which itself was a transplant. Her GFR—glomeralak filtration rate—was only 23.8%,

12

and her creatine level was 2.2, more than double the normal level for females (normal 0.6 to 1.1 mg/dL). Her renal insufficiency level was four, just one stage below the stage that requires another organ transplant or dialysis. Dr. Androgue opined that Mrs. White's kidney function was less than 25% and furthermore, her creatine level on autopsy was 2.6. This independent, scientifically reliable data wholly supports the observations and conclusions of both Dr. Fields and Dr. Androgue. The levels of opiates on autopsy were toxic to lethal. Furthermore, Dr. Fields' actual opinion on causation stated that the renal insufficiency caused the *drugs* to build up in her system, not the metabolites.[5] In sum, the overwhelming evidence indicated severe renal insufficiency.

Appellee also argues that Mrs. White did not exhibit symptoms of overdosing. When Mrs. White was briefly admitted to the hospital two days before her death, she was coherent, without slurred speech or notable respiratory symptoms. However, even appellee agrees that the Physician's Desk Reference states that increased sedation does not necessarily change the respiratory rate. Dr. Fields also testified that respiration may appear normal and that sedation systems vary from patient to patient. Both the autopsy and toxicology report leave little or no doubt that Mrs. White was overdosed.

In addition to suicide, appellee argued that Dr. Fields could not eliminate the possibility of accidental ingestion of the opiates. Appellee cites, *inter alia*, *Weiss v. Mechanical Associated Servs., Inc.*, 989 S.W.2d 120, 126 (Tex. App.—San Antonio

---

[5] This is not to say there would not concurrently be a buildup of metabolites. Either way, it is the renal insufficiency that causes a buildup of the toxins. While a toxicology report on metabolites could well have bolstered the testimony, the autopsy done in 2005 did not include that testing and such testing was therefore unavailable.

13

1999, pet. denied) for the proposition that *Havner* requires that expert opinions be devalued because "none of Weiss's experts were able to rule out other potential causes of Weiss's illness with reasonable certainty." *Id.* However, Dr. Scaff confounds his own assertion by insisting in a footnote to his own supplemental *Robinson* challenge to Dr. Fields' testimony that Mrs. White had consumed over twenty of the twenty-five Hydrocodone pills and only had a few left as of October 3 when she was also given Oxycodone. In his same motion, Dr. Scaff attacked Dr. Fields' assumption that Mrs. White followed her prescription instructions. However, appellee cited no evidence that Mrs. White failed to follow her dosing instructions, and we find none. To the contrary, we have already pointed to the considerable evidence that Mrs. White followed her dosing directives and in fact, according to one witness, had stopped taking Oxycontin as instructed at Providence Hospital in Waco, two days before she died. Dr. Androgue testified there was no evidence of suicide, that no one suggested suicide, and that the documents demonstrated she was not suicidal. Finally, Mrs. White's stomach was empty on autopsy.[6]

Dr. Scaff also suggests that perhaps Mrs. White took Tylenol in the days before her death which could cause liver dysfunction. First, Dr. Scaff's prescription of Hydrocodone included Acetaminophen, 500 mg. Secondly, the argument is undermined by his own brief: "Thus, according to the literature produced and relied upon by the Whites' experts, it is unlikely that the drugs accumulated in Mrs. White because the liver became overwhelmed."[7] Finally, there is no evidence in the autopsy of liver involvement.

---

[6] See our discussion of "ghost pills" below.
[7] See Brief of appellee Bruce Scaff, M.D. at page 15.

14

Appellee also cites *Wiggs v. All Saints Health Sys.*, 124 S.W.3d 407, 412 (Tex. App.—Fort Worth 2003, pet. denied), for the principle that experts must sufficiently rule out other causes. While we agree with this proposition as a general statement, in *Wiggs*, the experts wholly failed for multiple reasons:

> Analyzing the evidence in this case in light of the *Daubert/Robinson* factors, we conclude that the evidence shows that the theory relied on by the experts has not been sufficiently tested, is controversial within the relevant scientific community, requires subjective interpretation, and has not been subjected to sufficient peer review. Moreover, the evidence shows that the experts failed to sufficiently rule out other causes. On appeal, the Wiggs fail to argue that their experts' causation testimony was reliable under the *Daubert/Robinson* factors and do not attempt to contradict the evidence cited by appellees to establish unreliability under the factors. The trial court, therefore, did not abuse its discretion in determining that the experts causation testimony was scientifically unreliable under the *Daubert/Robinson* factors.

*Id.* Here, the Whites clearly showed that the causation testimony was reliable and sufficiently contradicted the evidence cited by appellee's multiphasic approach. And finally, the admissibility of an expert opinion does not depend upon the expert disproving or discrediting every possible cause other than the one espoused by him. *Viterbo*, 826 F.2d at 424.

**B. Dr. Adrogue**

Horacio C. Adrogue, M.D., F.A.C.P., is board certified in both internal medicine and nephrology. He is Chief of Clinical Nephrology at Methodist Hospital, Houston, former chief of the renal section at Houston's VA hospital, and now an attending physician there. He is also a professor of medicine at Baylor College of Medicine. Dr. Adrogue also stated and testified that Dr. Scaff breached the standard of care owed to Mrs. White by prescribing lethal and toxic doses of Hydrocodone and Oxycontin, which caused her death. Dr. Adrogue's testimony differed markedly because he stated that

15

Dr. Scaff misdiagnosed Mrs. White's leg pain. The pain, in his opinion, was caused by the statin (Pravachol 400 mg daily) she was taking, not a stress fracture. Mrs. White had previously suffered myalgia from another statin, Lipitor. Two sets of X-rays were negative for fracture.[8] Accordingly, neither opioid should have been prescribed. Instead, she should have been taken off the statin. According to Dr. Adrogue, opium derivatives like Hydrocodone or Oxycontin are used, the dosage must be at least reduced by half, given Mrs. White's renal insufficiency and low GRF. Both drugs should not have been given at the same time because of the serious risk of toxicity and death.

Dr. Adrogue admitted that he could not say with certainty that Mrs. White did not commit suicide. He testified, however, that there was not a single note in the medical records suggesting she was suicidal. "The documents demonstrate that the patient was not suicidal so that there's no reason to think that it was a suicidal attendant." While he also could not rule out Mrs. White accidentally took too much of her medications, he testified "[t]hat is also very unlikely because of the high levels."

There is no analytical gap in Dr. Adrogue's opinion on causation. He based his opinions on reliable data, his experience and observations, and he showed how the data supported his conclusions. His foundational data included the medical records, pharmaceutical records, the testimony, autopsy, toxicology reports, and other medical tests.

Dr. Scaff attacks the causation opinion of Dr. Adrogue on essentially the same grounds as Dr. Fields. In addition, he challenges that even under Dr. Androgue's opinion that there was no leg fracture, Mrs. White still required the administration of pain killers. Appellee also points out that Dr. Androgue admitted that Oxycodone is not

---

[8] An intervening bone scan showed an anomaly that could be consistent with a stress fracture.

16

primarily excreted by the kidneys and that it is the metabolites that the kidneys process. In this regard, we already noted that Mrs. White only had the one kidney and it was transplanted. However, Dr. Androgue testified that the Oxycodone has the dominant role in depressing the central nervous system. One does not need to measure the lesser effective metabolites to know that there is a buildup of everything in a patient with renal failure. Mrs. White took Oxycontin—the parent drug. That is changed by the body to Oxycodone. Oxycodone is in part metabolized by the liver, and then tends to be excreted by the kidney. There is a buildup of everything in a patient with renal failure because the half-life of elimination of Oxycodone is prolonged in a patient with renal insufficiency. According to Dr. Adrogue, in the autopsy report, the pathologist measured or documented the parent drug levels as the cause of death.

Dr. Scaff repeats his argument that without knowing the metabolite level, you cannot know the kidneys were causally involved. Dr. Scaff argues that: "[w]ithout a significantly elevated metabolite level, any other mechanism that could cause an elevation of the parent drug level remains an alternative possible cause of Mrs. White's death that cannot be excluded." Yet Dr. Scaff offers no evidence or science that there was another mechanism which caused the lethal and toxic levels found in Mrs. White leading to her death. The missing analytical gap, if any, is in the appellee's argued theory, not the testimony of Drs. Field and Androgue. The overwhelming evidence shows renal insufficiency. This is even admitted by Dr. Scaff. And Dr. Androgue specifically rejected the defense argument about necessarily measuring metabolite levels. He testified: "[t]he half life of elimination of Oxycodone is prolonged in patient with renal insufficiency. So it's not just the metabolites. The half life is prolonged. And

17

the metabolites are really returned severely impaired, so everything is retained." He further opined that it is the drug, not metabolites, with pharmacological effect on the brain, the drug that had analgesic effect, and caused central nervous system depression. This is what kills the patient, he said. We conclude that Dr. Scaff's attorney's metabolite argument goes to the weight of the evidence, not its admissibility. *See Kramer*, 858 S.W.2d at 405 (the plaintiff is required to prove only that it is "more likely than not" that the injury was caused by the negligence of one or more defendants).

To the trial court and on deposition, Dr. Scaff's attorney conjectured that Mrs. White could have suffered fatal arrhythmia. Dr. Adrogue stated there was no evidence for that. Dr. Scaff's attorney also questioned the presence or absence of "ghost pills." Had Mrs. White chewed several Oxycontin pills or "accidentally" ingested extra pills, the pill casings might have been found in her body on autopsy. The autopsy protocol found no such casings. In fact, as we noted, Mrs. White's stomach was empty.

Dr. Scaff claims that the only hearing on his challenge to Dr. Adrogue's expert testimony was on April 1, 2010, and that the Whites offered no evidence. It is clear from the record that Dr. Adrogue's deposition was not scheduled until April 6, and that the trial judge carried the hearing forward, explaining to the parties that he would be in a better position to rule on Dr. Adrogue's testimony closer to trial. On April 2, counsel for Dr. Scaff sent a letter to the court addressing certain concerns of the trial court. It was not until April 12 that defense counsel filed his motion to exclude the opinions and testimony of Dr. Adrogue. The deposition of Dr. Androgue, which was taken on April 6, was attached as exhibit 1 to the defense motion to exclude Dr. Androgue's expert

18

opinions. Also attached to the defense motion was, inter alia, Dr. Androgue's expert report. Dr. Scaff also moved the court to move up the hearing date on Dr. Androgue, which apparently it did. The trial court ruled April 12 that he was excluding significant portions of Dr. Adrogue's *testimony* on causation. So from previous motions filed, and hearings, or from Dr. Scaff's own offerings, the trial court was informed of Dr. Adrogue's testimony. We find no merit in this argument. *See* TEX. R. CIV. P. 1.

Recovery in a medical malpractice case requires proof to a reasonable medical probability that the injuries complained of were proximately caused by the negligence of a defendant. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 860 (Tex. 2009); *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995). Proximate cause includes two components: cause-in-fact and foreseeability. *LMB, Ltd. v. Moreno*, 201 S.W.3d 686, 688 (Tex. 2006) (per curiam). Proof that negligence was a cause-in-fact of injury requires proof that (1) the negligence was a substantial factor in causing the injury, and (2) without the act or omission, the harm would not have occurred. *Id.*

The plaintiff must establish a causal connection beyond the point of mere conjecture or speculation; proof of mere possibilities cannot establish causation. *Lenger v. Physician's General Hosp., Inc.*, 455 S.W.2d 703, 706 (Tex. 1970); *Bryant v. Levy*, 196 S.W.3d 166, 170 (Tex. App.—Amarillo 2006, pet. dism'd); *Thomas v. Farris*, 175 S.W.3d 896, 898–99 (Tex. App.—Texarkana 2005, pet. denied.). A plaintiff, however, is neither required to establish causation in terms of medical certainty nor is the plaintiff required to exclude every other possible hypothesis. *See Kramer.*, 858 S.W.2d at 405; *First Assembly of God, Inc. v. Tex. Utilities Elec. Co.,* 52 S.W.3d 482,

19

493 (Tex. App.—Dallas 2001, no pet.); *Bryant,* 196 S.W.3d at 170. The plaintiff is required to prove only that it is "more likely than not" that the injury was caused by the negligence of one or more defendants. *See Kramer*, 858 S.W.2d at 405; *Bryant*, 196 S.W.3d at 170; *Thomas*, 175 S.W.3d at 899.

The law does not, and should not require proof of an absolute certainty of causation or any other factual issue. *Kramer,* 858 S.W.2d at 405. Rather, the law settles for some lower threshold of certainty, whether beyond a reasonable doubt in criminal law, clear and convincing evidence in certain civil matters involving constitutional rights, or the more typical civil burden of reasonable probability*. Id.* (citing *John William Strong, et al.*, MCCORMICK ON EVIDENCE §§ 339–341, at 437–49 (4th ed. 1992)). Rule 702 contains three requirements for the admission of expert testimony: (1) the witness must be qualified; (2) the proposed testimony must be "scientific . . . knowledge"; and (3) the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. In order to constitute scientific knowledge which will assist the trier of fact, the proposed testimony must be relevant and reliable. Both Dr. Field and Dr. Androgue have excellent qualifications and both actively practice and teach in the relevant fields of inquiry. Their testimony is unquestionably scientific knowledge and assists the trier of fact in understanding the considerable evidence, is tied to and based upon the facts, and assists the jury in determining the medical causation. *See United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985); *see Daubert*, 509 U.S. at 590–91.

In addition to being relevant, the underlying scientific technique or principle must be reliable. Scientific evidence which is not grounded "in the methods and procedures of

20

science" is no more than "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Unreliable evidence is of no assistance to the trier of fact and is therefore inadmissible under Rule 702. *Robinson*, 923 S.W.2d at 556-557.

There are many factors that a trial court may consider in making the threshold determination of admissibility under Rule 702. These factors include, but are not limited to:

(1) the extent to which the theory has been or can be tested;

(2) the extent to which the technique relies upon the subjective interpretation of the expert,

(3) whether the theory has been subjected to peer review and/or publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses which have been made of the theory or technique.

*Id.*

Both Dr. Fields and Dr. Androgue relied upon and their opinions were grounded upon the following scientifically established facts: (1) autopsy showing accidental death caused by ingestion of Hydrocodone and Oxycontin; (2) the toxicology report showing Hydrocodone-blood as 205.2 ng/ml, and Oxycodone-blood as 610.0 ng/ml, lethal and toxic doses, respectively; (3) Glomeralak filtration rate of only 23.8 (GFR); (4) creatine testing before Mrs. White's death indicated a high level of 2.2 and 2.6 on autopsy; (5) medical records established Mrs. White's weight was 84 to 90 pounds before death and 83.6 on autopsy; (6) medical records showing a kidney transplant at age 15; (7) Dr.

21

Scaff's prescription in late September, 2005 of Hydrocodone w/APAP 5/500 # 25 and one week after, his prescription of Oxycontin ER 20 M.g. #50 with ensuing death five days later, October 8, 2005; (8) Mrs. White's known renal insufficiency level of four; (9) medical literature; and (10) pharmaceutical records. Thus, the bases of their opinions were not theoretical and were anchored on thoroughly tested procedures. *See id.* There is little or no subjective interpretation of the data*. See id.* Unquestionably the science of autopsy, toxicology, GFR, creatine testing, *et cetera,* has been subject to peer review. *See id.* The potential error rate is nil, although Dr. Scaff's attorney noted a slight weight differential over time. *See id.* Unquestionably, all the testing performed was generally accepted by the scientific community. *Id.* And significantly, virtually all of the data bases for their opinions were derived from non-judicial use and thus less likely to be biased toward a particular result. *Id.* at 559.

In effect, Doctors Fields and Androgue applied both of their own considerable experience as well as principles of differential diagnosis, the basic method of internal medicine. Generally speaking, when properly conducted, the technique has important non-judicial uses, is generally accepted as valid by the medical community, and has been subjected to use, peer review, and testing. *Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 604–05 & n.24 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (en banc). Still Dr. Scaff argues that the testimony contains analytical gaps, which are essentially the possibility of suicide, accidental overdose, arrhythmia, metabolites and Tylenol use. As we delineated at length above, both doctors based their causation opinions on reasonable medical probability. They need not disprove or discredit every possible cause other than the one they espouse. *Transcon,* 330 S.W.

22

3d at 216–20; *Viterbo*, 826 F. 2d at 414. Nevertheless, we conclude that both experts excluded these and other plausible causes, with reasonable medical certainty. Most of the defense theories were themselves unsupported by scientific data or professional observations while the available data showed no history of medication abuse, Mrs. White followed instruction for prescriptions, no suicidal ideation, no ghost pills, empty stomach, no evidence of arrhythmia or liver involvement, and a prescription for a full strength routine dose of overlapping opiates without any reduction for her sex, weight or known renal insufficiency. In Dr. Scaff's brief of the factual background, he insists that Dr. Fields testified the kidneys excreted the metabolites, not the drugs themselves. This is inaccurate. Dr. Fields testified the "*drugs* are predominantly excreted by the kidney" (emphasis added). The doctor answered in the affirmative that metabolites would be excreted by the kidney but he did not say the kidneys only excreted metabolites as argued by Dr. Scaff's attorney. Concerning Oxycontin, Dr. Fields did say the kidneys primarily excrete the metabolites but he also indicated one did not need to know the metabolites to know what the renal involvement is. The medical literature supports the pharmacokinetics that the kidneys excrete the parent drugs as well. At a minimum, at least three scientific articles found in the record support the causation testimony of Doctors Fields and Androgue. *See* "Opioid Safety in Patients with Renal or Hepatic Dysfunction" by Sarah J. Johnson, PharD., Pain Treatments Topics, 2007, (indicating: (1) need to reduce routine dose by at least 50% and cautious use; (2) two to four fold plasma concentration versus time increase in moderate and severe renal failure respectively; and (3) best to avoid codeine in patients with renal insufficiency, etc.); *see* "Opioid Metabolism," Howard S. Smith, M.D., Mayo Clinic Proc., July 2009 (central

23

opioid effects of Oxycodone are governed primarily by the parent drug with negligible contribution from circulating oxidative and reductive metabolites, etc.);[9] *see also* "Opioid Pharmacology," by Andrea M. Trescot, M.D., et al, Pain Physician, 2008 (stating morphine is characterized as a relatively long acting opioid.)

An expert may also rely upon his knowledge, experience and training as well as published medical literature. *Halim v. Ramchandani*, 203 S.W.3d 482, 490 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (a court need not apply the six *Robinson* factors to expert testimony, whether scientific or not, that is based on the expert's experience and knowledge in his field) (citing *Gammill*, 972 S.W.2d at 726–28); *see also In re D.S., D.S., D.S. and C.R.R.,* 132 S.W.3d 613, 620–23 (Tex. App.—Fort Worth, 2000, no pet.).

Drs. Fields and Androgue reasonably ruled out the defense's argued theories, which largely lacked scientific reliability and were speculative. Their expert opinions provided a proximate cause that excluded, with reasonable medical probability, Dr. Scaff's other suggested causes of death. Once they effectively responded to Dr. Scaff's theories with reliable testimony, the question was no longer of admissibility or legal sufficiency, "but rather one of competing evidence to be weighted by the jury." *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 40–41 (Tex. 2007).

The testimony of a qualified expert is generally admissible when scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact issue. *See* TEX. R. EVID. 702. The trial court correctly found no problem with the expertise of Doctors Fields and Androgue. Focusing then on the reliability aspect, the extensive medical literature used by both experts

---

[9] We are sympathetic to the trial court who presides over a three county circuit. At one of the hearings, he remarked he had five capital murder cases then pending. It would be miraculous if he were afforded time to scan the medical literature. Indeed, our review was necessarily not exhaustive.

24

demonstrated that the narcotics prescribed to Mrs. White would last two to four times longer than in a patient without renal insufficiency and should have been significantly reduced from the normal dose given by Dr. Scaff.

The trial court's role is not to determine the truth or falsity of the expert's opinion. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994). "Rather, the trial court's role is to make the initial determination whether the expert's opinion is relevant and whether the methods and research upon which it is based are reliable. There is a difference between the reliability of the underlying theory or technique and the credibility of the witness who proposes to testify about it." *Robinson*, 923 S.W.2d at 558. The trial court is not to determine whether the expert's conclusions are correct, but only whether the analysis used to reach them is reliable. *Gammill*, 972 S.W.2d at 728. Evidence of a "reasonable medical probability" or "reasonable probability" that an injury was caused by the negligence of one or more defendants means simply that it is "more likely than not" that the ultimate harm or condition resulted from such negligence. *See Lenger*, 455 S.W.2d at 707.

The ultimate standard of proof on a causation issue is whether the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred. *See Kramer*, 858 S.W. 2d at 400. Based upon years of treating patients with renal insufficiency, the unequivocal autopsy and toxicology reports supporting their opinion that Mrs. White died from an accidental overdose of Hydrocodone and Oxycontin, and the extensive data concerning Mrs. White's known renal insufficiency, clearly the causation opinions by these highly

25

qualified experts met the reliability requirements for admissibility and their exclusion from evidence was an abuse of discretion. *See Robinson,* 923 S.W. 2d at 556*.*

## IV. SUMMARY JUDGMENT

Dr. Scaff's no evidence motion for summary judgment was primarily predicated upon the premise that the Whites' only experts were stricken. The motion plainly states that the trial court excluded portions of the expert testimony and therefore the Whites did not have reliable admissible testimony from an expert to support their case. In determining whether the non-movant has produced more than a scintilla of evidence, we review the evidence in the light most favorable to the non-movant, crediting such evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Tamez*, 206 S.W.3d at 582; *City of Keller*, 168 S.W.3d at 827.

Because we have held that the trial court erred by refusing the admission of the expert testimony of both Doctors Fields and Androgue, and considering that evidence outlined above, we conclude that there is some evidence to defeat Dr. Scaff's motion for summary judgment. The excluded evidence included reliable evidence indicating Dr. Scaff's negligence caused the overdose of narcotics that proximately caused the death of Mrs. White. The excluded testimony of Dr. Androgue also provided reliable evidence that Dr. Scaff was negligent in not considering statin as a cause of Mrs. White's pain and misdiagnosing Mrs. White's leg pain as being caused by a stress fracture. Thus, the summary judgment was improper because the Whites produced evidence raising genuine issues of material fact on the principal issue before the court. *See* TEX. R. CIV. P. 166a(i).

Dr. Scaff's motion also addressed the issue of gross negligence. Specifically, he argued there was no evidence that his conduct amounted to heedless and reckless disregard of the rights, welfare and safety of Mrs. White, or conscious indifference to her rights. The Whites point to no such evidence, and we find none. Furthermore, the motion states that the Whites stipulated they would not seek recovery for exemplary or punitive damages and the Whites do not protest this assertion. We accordingly affirm this portion of the summary judgment.

The summary judgment motion also argued the lack of expert testimony to recover pecuniary loss, loss of expectancy and inheritance, and medical expenses. We find no legal authority or support from the record for the requirement of expert testimony on all pecuniary damages. Lay testimony is adequate to prove causation in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition. *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984) (citing *Lenger,* 455 S.W.2d at 706). Generally, lay testimony establishing a sequence of events which provides a strong, logically traceable connection between the event and the condition is sufficient proof of causation. *Id.* (citing *Griffin v. Tex. Employers' Ins. Ass'n*, 450 S.W.2d 59, 61 (Tex. 1969)). Insofar as expert testimony may be required for medical expenses or otherwise, direct testimony from both Dr. Fields and Dr. Androgue established some evidence of a causal link between the injuries suffered and subsequent medical care that Mrs. White received. *See Christus Health & Christus Health Gulf Coast v. Dorriety*, 345 S.W.3d 104, 110 (Tex. App.—Houston [14th Dist.] 2011, pet denied).

27

## V. CONCLUSION

We affirm in part, and reverse and remand. We sustain the Whites' first two issues. We hold that the trial court abused its discretion by excluding the proffered expert testimony on causation of both Dr. Fields and Dr. Androgue as not being reliably based. We sustain in part the Whites' third issue and reverse and remand the summary judgment granted on all issues except with regard to gross negligence and punitive damages. This latter portion of the summary judgment is affirmed.

DON WITTIG
Justice

Delivered and filed the
5th day of July, 2012.